GUNDERSON, Respondent v. SOPIWNIK, Appellant

(66 N. W.2d 510)

(File No. 9437.  Opinion filed October 22, 1954)

**Robert Wallin,** Hettinger, N. D., **Jackson & Krause,** Lemmon, for Plaintiff and Respondent.

**Davenport, Evans, Hurwitz & Smith,** Sioux Falls, for Defendant and Appellant.

RUDOLPH, J.  Plaintiff brought this action to recover damages for injuries she received while a passenger in the automobile owned and driven by defendant.  Plaintiff recovered judgment and defendant has appealed.

The facts most favorable to plaintiff are the following: Plaintiff and defendant are sister and brother.  Plaintiff is nine years older than defendant and was married and left home when defendant was thirteen years old.  The family home was Minneapolis and plaintiff had been home four times during the fourteen years she had been married.  On one of these visits defendant was at home, that being the occasion of his marriage in 1950.  This was the only time plaintiff had seen defendant during eight years preceding July 4, 1952.  They did not correspond but through their parents each had knowledge of the other.  Plaintiff's home was Hettinger, N. D., defendant's Minneapolis.

Defendant, his wife and child, left Minneapolis on July 3, 1952 on a contemplated trip to the Black Hills.  They ar-

rived at plaintiff's home in Hettinger on the morning of July 4. There had been no express invitation on this occasion but plaintiff had expressed a desire to have members of the family visit her. The afternoon of the 4th, plaintiff, defendant and their families, went to Bowman to a rodeo. They made the trip in defendant's car as plaintiff and her husband were without a car at the time. On this trip plaintiff's husband paid two dollars for gas and then paid for the tickets to the rodeo.

The next day, Saturday, defendant had a car repair bill of twenty-five dollars, and when he came home and announced that because of this expense the "trip to the Hills is off". He said he would stay in Hettinger until Wednesday or Thursday and then go back to Minneapolis, in other words he would extend his visit in plaintiff's home. There was some discussion about plans for Sunday and finally at plaintiff's suggestion it was agreed they would go to Lemmon to attend a show which plaintiff wanted to see, and also go to Petrified Park. It was understood that the trip would be made in defendant's car. Plaintiff's children and defendant's child were to be cared for at home by a younger sister of plaintiff and defendant who plaintiff said she would pay for staying with the children.

The party left for Lemmon about five o'clock Sunday afternoon on Highway 12. Defendant drove the car and his wife was in the front seat. Plaintiff and her husband sat in the rear. Plaintiff testified that the road to Lemmon was a new oil mat, smooth and wide. As they traveled plaintiff was sitting with her right leg under her and visiting with defendant's wife. Defendant traveled about the same speed during the trip, which was "fast—quite fast", but plaintiff never complained or cautioned him to drive slower. The last plaintiff remembered was that she saw the drive-in theater near Lemmon as she was looking out to the north while the car was traveling east.

The accident occurred at the point where Highway 73 intersects Highway 12, west of Lemmon. Vehicles approaching this intersection from the east on Highway 12 can be observed for a distance of 1,000 feet. To the west of the inter-

section the highway is straight and level for a distance of 4,000 feet. Defendant was approaching the intersection from the west. This intersection is in the shape of a T, in that Highway 73 does not continue north. Highway 73 spreads out before joining Highway 12, one fork for traffic intending to turn west, the other for east bound traffic. The distance between these two forks on Highway 12 is 225 feet. On Highway 12 about 400 feet west of the west fork of Highway 73 there is a "Slow" sign. Defendant testified that as he approached this "Slow" sign he took his foot from the accelerator, and was confirmed in this by plaintiff's husband, who further testified that in his estimation defendant was driving faster than sixty miles an hour on the trip but that he would not consider the speed excessive.

Defendant observed a car approaching the intersection from the east as he was about at the "Slow" sign. The car approaching from the east will be referred to as the Engle car. When first observed by defendant the Engle car was about 300 feet east of the east fork of the intersection. Defendant replaced his foot on the accelerator and continued on into the intersection at approximately his prior speed. There was a car stopped in the east fork of the intersection awaiting traffic on Highway 12 to pass. The Engle car was traveling about 25 to 30 miles an hour. As defendant was proceeding through this intersection as above detailed the Engle car turned across his path apparently intending to go south on the east fork of Highway 73. The collision occurred in the south lane of the highway eleven feet east of the east fork of Highway 73, between the left front of defendant's car and the right front of the Engle car. Defendant's car skidded eleven feet before impact, and the cars came to rest about ten feet southeast of the place of impact. Both cars were demolished. Defendant's wife and Engle were killed, and plaintiff and her husband badlly injured.

Two questions are presented. First, was plaintiff a guest passenger in defendant's car within the meaning of SDC 44.0362. We quote the statute:

"Guest in automobile can recover damages only for willful and wanton misconduct. No person

transported by the owner or operator of a motor vehicle as his guest without compensation for such transportation shall have cause of action for damages against such owner or operator for injury, death, or loss, in case of accident, unless such accident shall have been caused by the willful and wanton misconduct of the owner or operator of such motor vehicle, and unless such willful and wanton misconduct contributed to the injury, death, or loss for which the action is brought; and no person so transported shall have such cause of action if he has willfully or by want of ordinary care brought the injury upon himself."

Second, if a guest, was the evidence sufficient to submit to the jury the question of whether the conduct of defendant was "willful and wanton" within the meaning of the statute.

The question of whether an automobile passenger is a guest within the meaning of our guest statute has been before this court on several occasions. In the case of Schiltz v. Picton, 66 S.D. 301, 282 N.W. 519, 520, it was said:

"While it might be that under this statute actual payment in money or other tangible thing is not necessary to exclude one from its terms and render one not a guest, nevertheless, we believe that the statute contemplates some benefit accruing from the transportation to the owner or operator of the motor vehicle in order to render a passenger in a motor vehicle not a guest. Such benefits as are compatible with hospitality, companionship or good fellowship accruing to the owner or operator are not sufficient to take the passenger out of the guest classification."

This rule was in effect affirmed in the case of Forsling v. Mickelson, 66 S.D. 366, 283 N.W. 169, but it was there held that the consideration need not pass from the passenger to the driver. If the driver receives a direct benefit from another, the service is not gratuitous and there is no guest relationship. The rule was again affirmed in the case of Scotvold v. Scotvold, 68 S.D. 53, 298 N.W. 266, 271, and in

that case it was said, with respect to the benefit that must accrue to the owner or operator, that it must be "sufficiently real, tangible and substantial to serve as the inducing cause of the transportation, and to operate to completely overshadow any considerations of mere hospitality growing out of friendship or relationship."

■ Prior to 1939 the statute read "without payment for such transportation". Rev.Code 1919, § 801, as amended by Laws 1933, c. 147. With the revision of the code in 1939 these words were changed to "without compensation for such transportation". This change did not affect the meaning of the statute as construed in the above cases. Scotvold v. Scotvold, supra.

To exclude plaintiff from the terms of the statute as construed in the cited cases it is argued that the jury might reasonably find from the evidence "that Defendant was substantially without funds to pay further expense away from home for himself, his wife and his child; that he desired to prolong his vacation another four or five days; that he proposed to do this by staying at Plaintiffs until such time as his work would demand his return to Minneapolis; that spending the same amount of time traveling about staying in tourist motels and eating in restaurants would normally cost from $40.00 to $75.00; that it was a benefit to Defendant to receive this from Plaintiff and Plaintiff's husband; that to insure his receiving this benefit some effort on his part to retain their good graces was necessary and desirable; that Plaintiffs were without transportation to do the things they desired; that the real and substantial motive which led Defendant to furnish transportation to Lemmon to the show was to retain the good will of Plaintiff."

■ We think the most that can be said for this argument is that it is ingenious. As was said in the Scotvold case to uphold the contention here made "would transcend reality." We do not believe any extended discussion is necessary, the facts most eloquently belie the assertion. We have brother visiting sister, the relationship was cordial and unfeigned. The record discloses nothing other than the typical brother visiting sister occasion. To hold simply because de-

fendant had unanticipated expense which extended his contemplated visit that he conceived the plan of transporting his sister to Lemmon to see the show in order that he might stay in her home a few days longer would be out of harmony with everything in the record as we read it. We hold that plaintiff was a guest passenger within the meaning of the statute.

■ ■ We believe it unnecessary to restate the rule governing the willful and wanton misconduct described in the statute. Melby v. Anderson, 64 S.D. 249, 266 N.W. 135; Martins v. Kueter, 65 S.D. 384, 274 N.W. 497; Granflaten v. Rohde, 66 S.D. 335, 283 N.W. 153; Elfert v. Witt, 73 S.D. 4, 38 N.W.2d 445; Stoll v. Wagaman, 73 S.D. 186, 40 N.W.2d 393; Antonen v. Swanson, 74 S.D. 1, 48 N.W.2d 161, 28 A.L.R. 2d 1; Espeland v. Green, 74 S.D. 484, 54 N.W.2d 465; Allen v. McLain, 74 S.D. 646, 58 N.W.2d 232. Essential to such conduct is the conscious realization by defendant that his acts will in all probability (as distinguished from possibly) produce the precise result which it did produce. We believe the facts and inferences to be drawn therefrom fail to show any such realization by defendant. True, defendant was driving too fast as he approached and entered this intersection, but there is nothing upon which to base a finding that he consciously realized that the driver of the Engle car would in all probability as distinguished from possibly turn across his path at a point where it would be impossible for defendant to stop before a collision occurred. No one in the car protested at any time concerning his driving, the road was straight and vision unobstructed. Plaintiff's husband on direct examination testified as follows:

"Q. Where was it (the Engle car) when you first saw it? A. On its own side.

"Q. Did you then see it turn? A. Yes.

"Q. And it turned in front of you—is that correct? A. Yes.

"Q. And then you collided? A. That's right.

"Q. Do you have any way or can you tell the jury or do you know how far you were away at the time the other car turned in front of you? A. No, I can't say."

On cross-examination he testified:

> "Q. Now this car that came down the road—the Engle car—it turned right in front of Steve's car—did it not—you knew there was going to be a collision when you saw the car turn? A. Yes.
>
> "Q. There was nothing that could be done to avoid a collision at that time was there? A. I couldn't say.
>
> "Q. Nothing that you could think of then—was there? A. No."

There would have been no accident had not Engle turned his car across the path of the defendant. And as stated above we can find nothing in the record upon which a jury could find that defendant consciously realized before it was too late to avoid the collision that Engle would in all probability turn in front of him.

The judgment appealed from is reversed.

All the Judges concur.