CLUTS, Appellant v. PETERSON, Respondent

(113 N.W.2d 273)

(File No. 9934. Opinion filed February 16, 1962)

Rehearing denied March 22, 1962.

**Loucks, Oviatt & Bradshaw**, Watertown, for Plaintiff and Appellant.

**Austin, Hinderaker & Hackett**, Watertown, for Defendant and Respondent.

RENTTO, P.J. This litigation involves our guest statute. The meaning of the law is pretty well established by our decisions but difficulty is often encountered in its application. That is the problem in this case.

Plaintiff was injured while riding in defendant's 1956 Ford Thunderbird Coupe, driven by the defendant. The accident happened on October 28, 1958, about 8 or 9 miles west of Watertown, South Dakota, on Highway #212 at about 11 p.m. His complaint alleges that on the occasion in question his status was that of a passenger and that the conduct of defendant, which caused his injuries, was willful and wanton misconduct. At the close of all the testimony the trial judge directed a verdict for defendant on the grounds that plaintiff was the guest of defendant without compensation and that defendant's conduct was not willful and wanton. From the judgment entered thereon plaintiff appeals. His principal complaint is that it was for the jury to say whether he was a guest or a passenger, and whether defendant's misconduct was willful and wanton.

Plaintiff was then 40 years of age and resided at Vienna, South Dakota, which is about 5 miles south of

Naples, South Dakota, where the defendant lived. Both of these towns are about 25 miles in a southwesterly direction from Watertown, which is the trading center of that area. His main occupation was operating a truck for hire, hauling stock and grain and he did a little farming on the side. The defendant was also in the trucking business and operated a farm located between Naples and Vienna. On occasions they spent time together socially and had worked together in the trucking business. They had known each other for about 20 years and were good friends. Defendant said they stayed at plaintiff's house the night before the accident. Plaintiff admitted that they slept there once but did not remember whether it was the night before the accident or not.

Defendant had a truck loaded with shelled corn on his farm which he was interested in selling. Apparently he and plaintiff discussed the matter. When asked on direct examination if he had a conversation with defendant in Vienna on the morning of the accident plaintiff answered:

> "Yes, we had a discussion about the load of corn he had on his truck, and I had corn of my own that I was interested in, so he asked me if I would go along with him."

On his cross-examination concerning this conversation the following appears:

> "Q. What was the gist of that conversation about the corn? A. Well, he was saying that he had this load of corn, that he had hired a sheller to shell it the day or two before that and was wondering where there was a good market for it.
>
> "Q. In other words, he asked you where there was a good market? A. Yes.
>
> "Q. And what did you tell him? A. Well, I said the best way to find out is to go out and inquire, so he asked me to go with him. So we started out."

When asked on direct examination the purpose of the trip they started out to make that morning he answered: "Primarily to sell this load of corn and find a higher priced market for it."

According to plaintiff he and defendant were together in the bar at Vienna about 8 o'clock on the morning of the day of the accident where each had a bottle of beer and talked about defendant's corn. They left Vienna between 8:30 and 9 a. m. with Naples as their destination. Their route went by defendant's farm so they stopped there and saw the truck load of corn but took no samples of it. While at the farm plaintiff phoned his brother-in-law at Egan, South Dakota, who manages the elevator there and asked him the price of corn. It was not sufficiently attractive so they drove to Naples arriving there about 9:30 a. m. They went to the elevator and asked the price of corn which was quoted to them, remaining in Naples about 15 minutes. From there they drove directly to Henry where they stopped at the elevator and talked to the man in charge about the price of corn but received no quotation. After that they visited a bar where each had a bottle of beer.

Then they drove to Watertown arriving at about 1 o'clock and stopped at the Livestock Sales barn for about 30 minutes. They observed the market and looked around for someone that would possibly be interested in corn but didn't talk to anyone about it. From there they went to the Watertown mill for only a few minutes where they inquired as to the price of corn but were quoted no price. Between 2:30 and 3 o'clock they went to the KP bar where they stayed for an hour or two and had something to drink. From that establishment they went to the Sears bar. How long they were there and what they did is unclear in his testimony. Eventually, plaintiff left this bar and went to defendant's car. Of events after that he faintly remembers only trying to pick himself up after the accident which happened when they were returning to Vienna. In addition to visiting the bars in Watertown enumerated by plaintiff

he said that they possibly stopped at another—the White Horse bar.

In the main defendant's version of their activities on the day of the accident corroborates plaintiff's testimony. Concerning the conversation they had before starting on their trip defendant said: "* * * we got to talking about corn prices so I kind of asked Gordon if he wanted to go along to Watertown. We didn't intend to farm that day at all because we were just riding around—". This is not denied, nor is his statement that they stopped at his farm because "there was nobody home there that night, and I just wanted to see if it was still there." In the 20 years that defendant had been farming he had never required assistance for finding a market for his corn.

The prices which they were quoted that day was for corn of a minimum moisture content. It is a matter of common knowledge that if the moisture content is greater than the minimum the price for it is accordingly reduced. This is determined by a rather simple test which utilizes a sample of the corn involved. Apparently all elevators buying corn are equipped to make this test. As stated above the parties did not have a sample of defendant's corn with them for this purpose.

After plaintiff had contacted a law firm to represent him in the matter, but before this action was commenced, plaintiff suggested to the defendant that he go to the office of plaintiff's lawyer and make a statement concerning their activities on the day of the accident. He went there accompanied by the plaintiff. A member of plaintiff's law firm testified about it as follows:

> "Mr. Peterson said that on the morning of the accident he came into Vienna from his farm, which was to the north of Vienna, and that he met Gordon Cluts on the street there; that they visited about the fact that, among other things, that Mr. Peterson had a truck load of shelled corn on his farm that he wanted to move, to sell, about 400 bushels, he

said, and that Mr. Cluts indicated to him that he was going to have some to sell before too long, and that they agreed together to start out that morning and try to find a market for that corn, particularly for Mr. Peterson's corn, which was ready for market; that he didn't recall whether or not he had specifically asked Mr. Cluts to go with him, but that he was glad to have him go, and it was very much to his benefit and advantage to have him go, because Mr. Cluts had trucked for a long time in the area, and knew a lot of people and a lot of buyers; that they did not check the price in Vienna because they knew the price there, but they got in Mr. Peterson's Thunderbird and drove to Naples, and checked with Mr. Dahl at the elevator there and got the price at Naples; then went to Henry, and first he said they checked with Mr. Hoftiezer at the elevator and then later he changed that because he remembered that Mr. Hoftiezer was ill and wasn't there. But someone had given them a price there. Then they went to Watertown, and to the Watertown Milling Company, and checked the price there, and then went out to the Loken sale barn and spent some little time that afternoon visiting with all of the men, he couldn't name any of them, who might be possibly in the market for a load of corn delivered."

Concerning the "benefit and advantage" referred to, the attorney further related that:

"He said Mr. Cluts had trucked for a number of years and he knew a lot of people who would be at the sale, and elsewhere, and it was his hope to perhaps turn this load of corn to some farmer or feeder who would pay more for it delivered."

Our guest statute SDC 44.0362, on which plaintiff's cause of action depends, reads as follows:

"No person transported by the owner or operator of a motor vehicle as his guest without

compensation for such transportation shall have cause of action for damages against such owner or operator for injury, death, or loss, in case of accident, unless such accident shall have been caused by the willful and wanton misconduct of the owner or operator of such motor vehicle, and unless such willful and wanton misconduct contributed to the injury, death, or loss for which the action is brought; and no person so transported shall have such cause of action if he has willfully or by want of ordinary care brought the injury upon himself."

While the statute uses the word "compensation" this does not mean only payment in money or other tangible thing. We have held that it also contemplates some benefit accruing from the transportation to the owner or operator of the motor vehicle. Schiltz v. Picton, 66 S.D. 301, 282 N.W. 519. In discussing the nature of this benefit we have said that it must be "sufficiently real, tangible and substantial to serve as the inducing cause of the transportation, and to operate to completely overshadow any considerations of mere hospitality growing out of friendship or relationship." Scotvold v. Scotvold, 68 S.D. 53, 298 N.W. 266. These principles were reaffirmed in Gunderson v. Sopiwnik, 75 S.D. 402, 66 N.W.2d 510 and Kleinhesselink v. Porterfield, 76 S.D. 577, 83 N.W.2d 191. That these requirements are satisfied is for the plaintiff to establish.

█ █ Ordinarily fact issues are for the jury to decide. However, there are situations in which they become questions of law for the court. That occurs when the evidence as to an ultimate fact is such that reasonable minds applying their intellectual processes thereto could arrive at but one conclusion. Jerke v. Delmont State Bank, 54 S.D. 446, 223 N.W. 585, 72 A.L.R. 7. In that determination when a directed verdict is sought the evidence must be viewed in the light most favorable to the party

against whom the motion is directed with all conflicts resolved in his favor.

[5] Plaintiff claims he was asked to go along because he knew a lot of people and the defendant would have a better chance of finding someone who would pay a high price for the corn with him along than otherwise. The only support for this is the wishful hope of the defendant first voiced by him long after the accident when he gave his statement to plaintiff's attorneys. Moreover, the record does not even intimate that plaintiff was acquainted with any prospective buyers who were not known to the defendant. We think it would be unreasonable on this record to find that these claimed benefits were "sufficiently real, tangible and substantial to serve as the inducing cause of the transportation, and to operate to completely overshadow any considerations of mere hospitality growing out of friendship." As was said in the Scotvold case such finding "would transcend reality". See 10 A.L.R. 2d 1369. On this record reasonable minds could only conclude that plaintiff was a guest without compensation.

■ ■ Under our statute a guest without compensation has a cause of action against the operator of a vehicle for his injury in case of an accident only if the accident was caused by the willful and wanton misconduct of the operator. Plaintiff contends that even if he was a guest, as we have held he was, it was for the jury to determine whether defendant's conduct was willful and wanton. The import of the terms "willful and wanton" is well settled. Most recently in Wittmeier v. Post, 78 S.D. 520, 105 N.W.2d 65, we again said:

> "It involves 'conduct which partakes to some appreciable extent, though not entirely, of the nature of a deliberate and intentional wrong'. Melby v. Anderson, 64 S.D. 249, 266 N.W. 135, 137. It is the element of deliberate recklessness which differentiates wilful and wanton misconduct from ordinary negligence."

Establishing this is also the burden of the plaintiff.

The accident happened on a gradual banked curve in the road over which defendant had driven on numerous occasions and which was in good driving condition. He said he was going 60 miles an hour but there is other evidence from which the jury might reasonably infer that he was going at a faster rate. Admittedly he lost control of the car when he reached to get a cigarette which had dropped to the floor. About then his car left the highway, hit a guy wire supporting a pole, and rolled over coming to a stop with its top resting on the ground. This does not constitute willful and wanton misconduct within the meaning of our guest statute. Berlin v. Berens, 76 S.D. 429, 80 N.W.2d 79.

■ Defendant acknowledged that about a month after the accident he entered a plea of guilty to a charge of reckless driving growing out of the same incident. Plaintiff urges this as additional evidence of the fact that defendant's conduct was willful and wanton. This position is not well taken. SDC 44.9921, our former statute on reckless driving, provided:

> "Any person who drives any vehicle upon a highway carelessly and heedlessly in willful or wanton disregard of the rights or safety of others, or without due caution and circumspection and at a speed or in a manner so as to endanger any person or property, shall be guilty of reckless driving * * *".

The words "willful and wanton" in the first definition of the offense in this statute had been defined to mean the same as they did in our guest statute. State v. Rossman, 64 S.D. 532, 268 N.W. 702. But this section was amended by Ch. 185, Laws of 1955. It now appears as SDC 1960 Supp. 44.9921 and reads as follows:

> "Any person who drives any vehicle upon a highway carelessly and heedlessly in disregard

of the rights or safety of others, or without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property, shall be guilty of reckless driving * * *".

By this change the willful and wanton feature was eliminated as an essential ingredient of the offense as it is described in the first definition. It is not an element of the offense under the second definition in either statute.

 The information on which he was arraigned charged that he "did willfully and unlawfully drive a motor vehicle upon a public highway carelessly and heedlessly in a disregard of the rights and safety of others, without due caution and circumspection, in a manner so as to endanger persons and property". Plaintiff argues that in pleading guilty to this charge, which contains the word willful, defendant admitted that his misconduct was willful. By pleading guilty to this charge he admitted only those facts which constitute an ingredient of the offense charged. Deliberate recklessness is not an element of our crime of reckless driving as presently defined. The evidence on the feature of willful and wanton misconduct viewed most favorably to the plaintiff does not present a submissible issue.

On the occasion above referred to when defendant made his statement to plaintiff's attorney, the attorney made notes of what defendant said and in his presence dictated a statement of the same in narrative form. From this a written statement was typed which defendant read and approved as being accurate, complete and true, but did not sign. It contained the admission that at the time of the accident he had a public liability policy with a named insurance company. Because of this the court refused to admit the written statement in evidence, but did permit the attorney who participated in its preparation to testify to the rest of the conversation. Plaintiff asserts that this ruling was erroneous and prejudicial.

In putting the conversation in evidence the attorney testified to substantially everything in the exhibit except the reference to liability insurance. Obviously this additional statement could have no bearing on the right of the court to direct a verdict for the defendant. Since we have concluded that the direction of a verdict by the court was proper we do not reach the admissibility question.

Affirmed.

All the Judges concur.