#27792-a-JMK
**2017 S.D. 36**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ESTATE OF RONALD E. JOHNSON,
by and through its Personal Representative,
LYNETTE K. JOHNSON, and LYNETTE
K. JOHNSON, Individually,

Plaintiffs and Appellants,

v.

DOUGLAS WEBER, TROY PONTO,
DARIN YOUNG, CRYSTAL VAN VOOREN,
DENNY KAEMINGK, LAURIE FEILER,
TIMOTHY A. REISCH, SOUTH DAKOTA
DEPARTMENT OF CORRECTIONS, STATE
OF SOUTH DAKOTA, and JOHN DOES 1-20,

Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA
\* \* \* \*

THE HONORABLE MARK SALTER
Judge
\* \* \* \*

DONALD M. McCARTY of
Helsper, McCarty & Rasmussen, PC
Brookings, South Dakota

and

JOHN W. BURKE of
Thomas, Braun, Bernard
  & Burke, LLP
Rapid City, South Dakota

Attorneys for appellants.

JAMES E. MOORE
JAMES A. POWER of
Woods Fuller Shultz &
  Smith P.C.
Sioux Falls, South Dakota

Attorneys for appellees.

\* \* \* \*

ARGUED FEBRUARY 14, 2017
OPINION FILED 06/14/17

#27792

KERN, Justice

[¶1.]     Lynette Johnson, individually and on behalf of the Estate of Ronald E. Johnson (collectively Johnson), appeals from an order granting summary judgment. Ronald E. Johnson (Ronald) was a South Dakota State Penitentiary correctional officer murdered by two inmates during an escape attempt. Johnson sued the Department of Corrections (DOC) and a number of its employees in state court. Count 3 of Johnson's complaint alleged a constitutional claim, pursuant to 42 U.S.C. §1983, for a violation of substantive due process rights under the state and federal constitutions. DOC removed the case to federal district court and filed a motion for summary judgment on the grounds of qualified immunity. The federal court granted summary judgment and remanded the remaining claims back to state court. Johnson appealed and the Eighth Circuit Court of Appeals affirmed the federal district court's order granting summary judgment.

[¶2.]     After the case returned to state court, DOC moved for summary judgment on Johnson's remaining claims, which the circuit court granted. Johnson appeals the dismissal of three of those claims: intentional infliction of emotional distress, fraudulent misrepresentation, and a due process violation under the state constitution. We affirm.

## Facts and Procedural History

[¶3.]     The facts of this case are tragic. Ronald E. Johnson worked as a correctional officer for DOC at the South Dakota State Penitentiary (SDSP) for twenty-four years in a variety of capacities. Before his untimely death, Ronald was part of the "Early Rec Crew." His duties included running daily recreational

periods; transporting inmates to various appointments and facilities; working in the dining hall; administering urinalyses, breathalyzers, pat downs, and strip searches; and completing various other duties. Ronald worked in all areas of the prison, taking on roles of absent employees.

[¶4.]       On April 12, 2011, Ronald was assigned to one of the Prison Industries buildings, where inmates work, attend school, or participate in programming. His duties included patrolling the hallways and common areas and monitoring inmate traffic. At approximately 10:45 a.m., a food truck arrived at the prison's West Gate. After permitting the truck to enter, guards discovered inmate Eric Robert (Robert) dressed in a correctional officer's uniform pushing a handcart loaded with a large box toward the gate. Inmate Rodney Berget (Berget) was hiding inside the box. The inmates made a violent and unsuccessful attempt to flee from prison staff and were apprehended. Robert's disguise prompted a search for the staff member to whom the uniform belonged. Ronald was found in the Prison Industries building stripped of his uniform, severely beaten, and unresponsive. He was rushed to Sanford Hospital, where he was pronounced dead at 11:50 a.m. Robert and Berget were later charged and convicted of murder in the first degree, and both received the death penalty. Robert was executed on October 15, 2012, and Berget remains incarcerated on death row.

[¶5.]       After the murder, DOC conducted an investigation and subsequently prepared a 28-page report dated May 9, 2011, entitled "SD Department of Corrections After-Incident Report" (Incident Report). The Incident Report, which was published on DOC's website, detailed the circumstances of Ronald's death and

DOC's evaluation and implementation of changes necessary to prevent future occurrences of violent escape. The Incident Report was revised numerous times by staff within DOC and by the Governor's Office. DOC was under no obligation to prepare the Incident Report. The report, which included overall recommendations to improve security at the facility, concluded that DOC staff correctly followed all policies and procedures.

[¶6.]     In Johnson's view, the Incident Report left out critical details regarding the events that led up to Ronald's murder. Both Robert and Berget had extensive criminal histories, including crimes of violence, and they were classified as maximum-security inmates. Berget had been convicted of multiple offenses, including grand theft, burglary, escape, and kidnapping, and was serving a life sentence for attempted first-degree murder. Robert was serving an 80-year term in prison for kidnapping. Robert had pulled a woman over on the road while impersonating a law enforcement officer before forcing her into the trunk of her car. Johnson also observes that the Incident Report makes no mention of the fact that DOC relocated both Robert and Berget from maximum-security cells in Jameson Annex to West Hall, a high-medium-custody housing unit at the SDSP in June 2004 and 2009, respectively.[1] West Hall inmates are supervised by security rounds and

---

1.     Custody classifications include maximum, high-medium, low-medium, and minimum.

cell checks. By contrast, inmates housed in Jameson Annex are subject to direct correctional supervision during movement and use of facilities.[2]

[¶7.] Johnson further argues that the Incident Report intentionally omitted facts demonstrating that this placement violated DOC classification policy in several respects. Specifically, Johnson argues that the Incident Report failed to disclose DOC's prior knowledge of Robert and Berget's plans, albeit made years earlier, to kill DOC staff and escape; that DOC staff had expressed concerns about Robert and Berget's classification; that certain forms allowing Berget to be housed at West Hall lacked necessary signatures and were incomplete; and that DOC officials allegedly violated DOC policy by lowering Robert and Berget's housing classifications to end their use of hunger strikes. Johnson claims that the omission of these and other facts—facts which Johnson contends demonstrate DOC's facilitation of Ronald's death—was self-serving and designed to cover up DOC's alleged responsibility for Ronald's death.

[¶8.] Based on these and other claims, Johnson sued DOC in state court on April 27, 2012, alleging (Count 1) wrongful death; (Count 2) a survival action; (Count 3) a 42 U.S.C. § 1983 claim; (Count 4) intentional infliction of emotional distress (IIED); (Count 5) negligent infliction of emotional distress; and (Count 6) fraudulent misrepresentation. With reference to Count 3, Johnson asserted claims under both the state and federal constitutions. Specifically, Johnson alleged that DOC's conduct affirmatively created the danger that led to Ronald's death in

---

2. For example, shower activity at Jameson Annex is supervised, whereas at West Hall it is generally unsupervised.

violation of his due process rights under the Fourteenth Amendment. Plaintiffs also alleged a violation of Ronald's due process rights contained in article VI, § 2 of the South Dakota Constitution. Defendants removed the case to federal court on the basis of Johnson's § 1983 claim. A brief summary of the federal litigation resolving this claim provides useful context for our decision.

[¶9.] The United States District Court of South Dakota granted summary judgment in favor of DOC on Johnson's § 1983 claim on the grounds of qualified immunity. Under the doctrine of qualified immunity, government officials are immune from suit and shielded from liability unless their conduct violates a clearly-established statutory or constitutional right known to a reasonable person. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396, 410 (1982). In its memorandum decision, the federal district court offered an extensive overview of the facts leading to Ronald's death. The court observed that both Robert and Berget were maximum-custody inmates and that DOC policy required they be housed in Jameson Annex barring a discretionary administrative decision specifying alternative housing. The court detailed the criminal histories of both men as well as their past escape attempts, including Berget's successful escape in 1984. The court noted that Robert had been disciplined as recently as 2007 for an escape attempt, while Berget's last documented attempt was made in 2003. The court additionally noted that a search of Berget's cell in August 2010 led to the discovery of razor blades and drill bits. Neither inmate, however, had a history of institutional violence.

[¶10.]     The court observed that DOC was aware of these facts when it transferred Robert and Berget to West Hall; additionally, it recognized that DOC failed to complete the process and necessary paperwork for authorization of such a transfer. Nevertheless, the court found that qualified immunity applied with respect to Johnson's § 1983 claim. The court observed that the Due Process Clause of the Fourteenth Amendment "protects individual liberty against certain government actions." However, the court recognized that the State is under no obligation to "protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S. Ct. 998, 1003, 103 L. Ed. 2d 249 (1989). The court thus concluded that "state actors are liable under the Due Process Clause only for their own acts and not for the violent acts of third parties[.]" The court noted, however, that the Eighth Circuit recognizes two exceptions to this rule. The State may be liable if the person harmed is in the State's custody, or when the State creates the risk that endangered the individual. *See Fields v. Abbott*, 652 F.3d 886, 890 (8th Cir. 2011). The second of these exceptions is referred to as the state-created-danger theory of liability. *Id.* Pursuant to such a theory, a plaintiff must prove "(1) that [he] was a member of a 'limited, precisely definable group,' (2) that the [official's] conduct put [him] at a 'significant risk of serious, immediate, and proximate harm,' (3) that the risk was 'obvious or known' to the [official], (4) that the [official] 'acted recklessly in conscious disregard of the risk,' and (5) that in total, the [official's] conduct 'shocks the conscience.'" *Id.* at 891 (quoting *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005)).

[¶11.] The court indicated that the fifth element of the *Fields* test requires that a plaintiff show that an official was deliberately indifferent to the danger created, meaning that the official was aware of facts from which an inference of substantial risk of harm could be drawn, and that the official actually drew such an inference. The court held that Johnson failed to prove as much: it explained that the complained of "conduct . . . is far removed from the ultimate harm to Ronald Johnson." Tying the analysis of conscience shocking to the second element of the test, the court found that too "much time passed between the initial decisions and the ultimate harm," beginning with Berget's transfer to West Hall in 2004 and ending with Ronald's death in 2011. The only action considered by the court was DOC's decision to grant Berget a job as a recycling orderly on March 18, 2011. While acknowledging that the job offered low supervision and enabled Berget to move about more freely, the court also observed that Berget had worked in such a capacity in various other positions "for many years without creating a known threat of harm to anyone." Thus, the court held that there was insufficient evidence to overcome DOC's defense of qualified immunity on Johnson's § 1983 claim. The court granted summary judgment on Count 3 and remanded the remaining claims to state court.

[¶12.] On appeal, the Eighth Circuit Court of Appeals affirmed. *Estate of Johnson v. Weber*, 785 F.3d 267, 273 (8th Cir. 2015). The Eighth Circuit closely examined whether Robert and Berget posed a risk of escape, noting that inmates in 2009 and 2010 relayed information to DOC indicating that Robert and Berget were planning an escape attempt. *Id.* at 270. However, the only evidence offered by

Johnson that Robert and Berget also intended to murder a guard came from a media interview provided by Jesse Sondreal, who prosecuted Robert and Berget for Ronald's murder. *Id.* According to the Eighth Circuit, the information possessed by Sondreal "did not originate from any of the defendants, but rather came from the Department of Criminal Investigation." *Id.* Moreover, "Sondreal could not identify any details of the alleged escape and murder plot[.]" *Id.*

[¶13.] The Eighth Circuit ultimately concluded that DOC's conduct did not shock the conscience. The Eighth Circuit observed that "Berget had worked as an orderly for many years without creating a known threat of harm to any correctional officer." *Id.* at 272. Additionally, DOC's decision to house Robert and Berget in West Hall despite its failure to follow certain procedures "[did] not shock the conscience, particularly in light of DOC policy allowing [the] Warden discretion in housing assignments." *Id.* at 273. While Robert and Berget had made escape attempts in the past and had "committed violent crimes before incarceration," the Eighth Circuit highlighted the fact that "neither Robert nor Berget had committed a murder and neither Robert nor Berget had committed a violent act in prison or shown any propensity for prison violence." *Id.* The Eighth Circuit determined that Johnson failed to prove that "DOC's policies on Warden discretion . . . shock the conscience" or that "the Warden acted with deliberate indifference in his transfers of Robert and Berget." *Id.* The Eighth Circuit Court of Appeals therefore affirmed the federal circuit court's grant of summary judgment on Johnson's § 1983 claim.

[¶14.] Upon remand to state court, DOC filed a motion for summary judgment on the remaining claims, which the circuit court granted. Johnson

appeals the court's order for summary judgment on Counts 3, 4, and 6, raising three issues for our review:

1. Whether the circuit court erred by dismissing Count 4, the IIED claim, concluding that DOC's conduct was not extreme and outrageous in publishing the Incident Report.

2. Whether the circuit court erred by dismissing Count 6, the fraudulent misrepresentation claim, by holding that there were no genuine issues of material fact in dispute.

3. Whether this Court should recognize in Count 3 a private cause of action for violation of the Due Process Clause found in article VI, § 2 of the South Dakota Constitution for injuries resulting from the Incident Report.

## Standard of Review

[¶15.] "We review a circuit court's entry of summary judgment under the de novo standard of review." *Heitmann v. Am. Family Mut. Ins. Co.*, 2016 S.D. 51, ¶ 8, 883 N.W.2d 506, 508. "On review of summary judgment, 'we decide only whether genuine issues of material fact exist and whether the law was correctly applied.'" *Rumpca v. Brenner*, 2012 S.D. 33, ¶ 8, 814 N.W.2d 128, 130 (quoting *Bordeaux v. Shannon Cty. Sch.*, 2005 S.D. 117, ¶ 11, 707 N.W.2d 123, 126). "The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists." *Brandt v. Cty. of Pennington*, 2013 S.D. 22, ¶ 7, 827 N.W.2d 871, 874. "We will affirm a circuit court's decision so long as there is a legal basis to support its decision." *Heitmann*, 2016 S.D. 51, ¶ 8, 883 N.W.2d at 509.

## Decision

[¶16.]     1.     *Whether the circuit court erred by dismissing Count 4,*
                  *the IIED claim, concluding that DOC's conduct was not*
                  *extreme and outrageous in publishing the Incident*
                  *Report.*

[¶17.]     The circuit court did not err by concluding that DOC's conduct was not extreme and outrageous. The elements of intentional infliction of emotional distress are:

> (1) an act by the defendant amounting to extreme and outrageous conduct; (2) intent on the part of the defendant to cause the plaintiff severe emotional distress; (3) the defendant's conduct was the cause-in-fact of plaintiff's distress; and (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct.

*Fix v. First State Bank of Roscoe*, 2011 S.D. 80, ¶ 19, 807 N.W.2d 612, 618. "The question whether the defendant's conduct was extreme and outrageous is initially for the trial court." *Id.* ¶ 20. "Proof under this tort must exceed a rigorous benchmark." *Harris v. Jefferson Partners, L.P.*, 2002 S.D. 132, ¶ 11, 653 N.W.2d 496, 500. "For conduct to be 'outrageous,' it must be so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Richardson v. E. River Elec. Power Coop.*, 531 N.W.2d 23, 27 (S.D. 1995). "[T]he tort of intentional infliction of emotional distress includes liability on the part of the defendant for reckless conduct resulting in emotional distress." *Petersen v. Sioux Valley Hosp. Ass'n*, 491 N.W.2d 467, 469 (S.D. 1992).

[¶18.]     Johnson argues that the circuit court erred in finding that Johnson failed to prove the first two elements of an IIED claim. Johnson contends that the

conduct involved herein regarding creation of an allegedly inaccurate Incident Report exceeds that conduct found extreme and outrageous in other cases.[3] Johnson also suggests that the relationship between plaintiff and defendant substantially impacts the analysis as to whether there is liability.[4] Here, Johnson argues that DOC's relationship to Lynnette Johnson as both Ronald's employer and a government agency renders the conduct even more egregious than in other cases where we have found conduct extreme and outrageous.

[¶19.]     The circuit court observed in its memorandum decision that "the statements and omissions from the Incident Report, even if self-serving and inaccurate, still do not meet the 'rigorous benchmark' for extreme and outrageous conduct. At most, the Incident Report was the DOC's parochial view of Mr. Johnson's murder that fell short of full disclosure." We agree. DOC's voluntary publication of the Incident Report contains nothing which goes beyond "all possible bounds of decency" and which would be "utterly intolerable in a civilized community." *Richardson*, 531 N.W.2d at 27.

---

3.     *See, e.g., Kjerstad v. Ravellette Publ'ns, Inc.*, 517 N.W.2d 419 (S.D. 1994) (whether spying on an employee in the bathroom amounted to extreme and outrageous conduct was a question upon which reasonable minds could differ, and so should have gone to the jury); *Bass v. Happy Rest, Inc.*, 507 N.W.2d 317 (S.D. 1994).

4.     In support of this proposition, Johnson cites *Watts v. Chittenden*, 22 A.3d 1214, 1221 (Conn. 2011) (examining relationship between father and mother of a child) and *House v. Hicks*, 179 P.3d 730, 737 (Or. 2008) (observing that "[t]he most important factor [in determining whether conduct was extreme and outrageous] is whether a special relationship exists between a plaintiff and a defendant . . . that shapes the interpersonal dynamics of the parties.").

[¶20.]     Johnson argues, however, that the Incident Report is "sanitized," contending that its publication is extreme and outrageous largely by way of omission. In Johnson's original complaint, Johnson alleged that DOC engaged in extreme and outrageous conduct by failing to disclose all the events which Johnson believes ultimately led to Ronald's murder. Johnson points to, for example, Robert and Berget's hunger strikes that took place in 2004 and 2009, which allegedly resulted in negotiated changes to their housing status. Further, Johnson argues that DOC misled Lynette Johnson "as to how [Ronald] was murdered and whether he suffered." Additionally, Johnson observes that the Incident Report concludes that penitentiary staff followed all policies and procedures, which Johnson asserts is untrue in light of the foregoing. In short, Johnson contends that the Incident Report's depiction of events evinces a desire to "hide the truth," despite knowing that Lynette Johnson "would be relying upon their representations to try and understand how she came to lose her husband in a part of the prison where only trusted inmates are permitted."

[¶21.]     However, Johnson fails to prove that these omissions—made in a voluntary report to the public—rise to the level of extreme and outrageous conduct. Johnson cites *Banyas v. Lower Bucks Hospital*, 437 A.2d 1236 (Pa. Super. Ct. 1981) and *Thomas v. Hospital Board of Directors of Lee County*, 41 So.3d 246 (Fla. Dist. Ct. App. 2010) in support of her contention that an IIED claim can be based on the publication of a false or misleading report. But both cases are readily distinguishable as they involve statements falsifying the cause of death. In *Banyas*, a patient, Thomas Lavin, died as a result of acts by defendant hospital and staff.

437 A.2d at 1238. Lavin was seeking treatment for injuries to his face and jaw as a result of an earlier altercation with Banyas. *Id.* at 1237. Defendants were alleged to have "intentionally propagated a falsehood when they wrote that Mr. Lavin's death was attributable solely to Mr. Banyas[.]" *Id.* at 1239. This led to Banyas being wrongfully charged with murder, among other counts. *Id.* at 1238. The court found "an intentional misstatement of the cause of death to be intolerable professional conduct and extreme and outrageous. Certainly, Mr. Banyas was substantially certain to suffer emotional distress following such a report." *Id.* at 1239.

[¶22.]     In *Thomas*, a woman was injected with a lethal overdose of a drug during surgery. 41 So.3d at 249. The doctor and nurses involved sought to cover up the incident and reported to the estate that she had died from the "stress of surgery." *Id.* During the funeral, a family member was contacted by the medical examiner, who, after "learn[ing] of the real cause of [her] death," "demanded that [the deceased's] body be returned to him immediately for a second autopsy." *Id.* These statements "led to the interruption of [the deceased's] funeral and the return of her body for a second, more thorough autopsy," which the court found gave "rise[] to the level of atrocious and utterly intolerable behavior which cannot be condoned in a civilized community." *Id.* at 256.

[¶23.]     These cases are factually distinguishable. Unlike *Banyas*, the Incident Report does not falsely impute the cause of death to a third party. And in *Thomas*, the court specifically took issue with the fact that the falsification of the cause of death interrupted the funeral and required the body be returned for a second

autopsy. *Thomas*, 41 So.3d at 256. From our review, the Incident Report does not contain the kind of deception complained of in *Thomas* or *Banyas*. Omissions from the Incident Report explaining the chronology of Robert and Berget's housing assignments and acquisition of jobs that enabled them to move freely about the prison are not deceptive like the statements made in *Banyas* or *Thomas*. In those cases, the tortfeasors did not simply omit important details. Rather, the defendants outright lied, leading to wrongful charges in Banyas's case and the interruption of a funeral and need for exhumation in *Thomas*. By contrast, the Incident Report correctly identifies those responsible for this horrendous crime—Robert and Berget.

[¶24.] Indeed, DOC did not attempt to pin the blame elsewhere. Rather, it acknowledged the severity of the situation by issuing the Incident Report, which recognized that further action was required on its part to ensure that such an incident did not reoccur. DOC's only potentially misleading representation was that "all policies and procedures" were followed. The language complained of appears at the end of the Incident Report:

> As with any critical incident within [DOC], a thorough review has been completed. This review resulted in modifications to Penitentiary facilities and procedures. Penitentiary staff followed all policies and procedures. The inmates were unsuccessful in their escape attempt.

Arguably, the policies and procedures referred to are those related to incidents of an escape attempt, not housing classifications. If, however, this language referred to housing classifications, the alleged violations regarding DOC's response to Robert and Berget's use of hunger strikes would have occurred years before the murder. Moreover, the Warden was vested with discretion to authorize the transfers. And,

as Appellees observe, with respect to Berget's annual reviews for housing classification, "mistakenly stating that all polices were followed when there were actually some instances when paperwork did not contain a sufficient number of signatures falls far short of extreme and outrageous conduct."

[¶25.]      Additionally, Appellees point to the fact that Robert and Berget had no institutional history of violence and that neither threatened staff in the days leading to Ronald's murder. Further, Appellees argue that criminal and escape histories are not statistically good predictors of violence and that no one warned DOC that either was planning to kill or injure a guard in April 2011. Nevertheless, given Robert and Berget's backgrounds, DOC's decision to house these inmates in West Hall was—if not tortious—unwise. But this is not the issue before us on appeal. The issue is whether DOC's conduct in publishing the Incident Report was extreme and outrageous. The record does not reflect an attempt by DOC to deceive or that it acted recklessly. We thus find that the conduct cannot meet the rigorous benchmark required by law, and we need not decide whether the second element of an IIED claim was met.[5]

---

5.      Appellees also contend that Johnson's IIED and fraudulent misrepresentation claims are barred by the workers' compensation exclusivity provisions of SDCL 62-3-2. The circuit court examined only whether Johnson's wrongful death and survival claims—which were not appealed here—were barred by the statute. The court found that they were barred because they did not fall under the exception for intentional torts. Appellees argue that this Court should hold that Johnson's IIED and fraudulent misrepresentation claims—although intentional torts—are nevertheless barred because they contain a "clear and strong dependency on the circumstances of Ron's death[.]" Because we agree with the circuit court's reasoning on the merits of Johnson's IIED and fraudulent misrepresentation claims, we decline to address this issue.

[¶26.]    2.    *Whether the circuit court erred by dismissing Count 6, the fraudulent misrepresentation claim, by holding there were no genuine issues of material fact in dispute.*

[¶27.]    The circuit court did not err in granting summary judgment on Johnson's fraudulent misrepresentation claim. A claim of fraudulent misrepresentation[6] is established by proving:

1) A defendant made a representation as a statement of fact;

2) The representation was untrue;

3) The defendant knew the representation was untrue or he made the representation recklessly;

4) The defendant made the representation with intent to deceive the plaintiff and for the purpose of inducing the plaintiff to act upon it;

5) The plaintiff justifiably relied on the representation;

6) The plaintiff suffered damage as a result.

*See N. Am. Truck & Trailer, Inc. v. M.C.I. Com. Serv.*, 2008 S.D. 45, ¶ 10, 751 N.W.2d 710, 714; *see also Delka v. Cont'l Cas. Co.*, 2008 S.D. 28, ¶ 30, 748 N.W.2d 140, 152. "In fraud and deceit claims, 'summary judgment is proper when a plaintiff produces no evidence of deceitful intent on defendant's part . . . .'" *Delka*, 2008 S.D. 28, ¶ 31, 748 N.W.2d at 152 (quoting *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 847 (S.D. 1990)).

[¶28.]    The circuit court found that even if the first three elements were satisfied, "the record does not contain evidence from which the court could . . . find

---

6.    Also known as a tort of deceit. *See* William L. Prosser, *Law of Torts* § 105 (4th ed. 1971), at 684-86. South Dakota has also codified deceit in SDCL 20-10-2, which "require[s] an affirmative misrepresentation or intentional suppression of facts." *Delka v. Cont'l Cas. Co.*, 2008 S.D. 28, ¶ 30 n.16, 748 N.W.2d 140, 152 n.16.

issues of material fact as to the [fourth, fifth, and sixth] elements of fraudulent misrepresentation." Because there is no evidence in the record supporting the fourth and fifth elements of Johnson's claim, the circuit court properly dismissed the claim.

[¶29.] As to the fourth element, deceitful intent, Johnson first observes that every reasonable inference must be drawn favorably toward Johnson as the nonmoving party. *Stern Oil Co. v. Brown*, 2012 S.D. 56, ¶ 8, 817 N.W.2d 395, 398. Johnson claims that, based on the testimony of Deputy Secretary of Corrections Laurie Feiler, DOC intended to induce Lynette Johnson to rely on the report. Feiler testified that while it was unclear whether the Incident Report would be made available to the public at the outset, it was expressed to Lynette Johnson "early on" that the report would be shared with her. Moreover, during Secretary of Corrections Denny Kaemingk's deposition, Kaemingk was asked whether "it was expected that [Lynette] Johnson [would] be able to rely on that report for an explanation as far as what took place." Kaemingk responded yes. Johnson argues that by failing to disclose facts about, for example, the hunger strikes, a reasonable inference could be drawn that DOC intended to "induce [Lynette Johnson] to refrain from blaming or otherwise seeking to hold the Defendants accountable for the murder of her husband."

[¶30.] However, a reasonable inference of deceitful intent cannot be drawn solely from the simple fact that DOC employees intended early on to make the Incident Report available to Johnson. As the circuit court noted, "there is no evidence that the defendants issued the Incident Report for [the] purpose of

inducing [Johnson] to act upon it." The Incident Report was ultimately published online as a public document, which anyone—including Johnson—could view. Moreover, while Johnson claims that DOC sought to induce Lynette Johnson to "refrain from blaming or otherwise seeking to hold the Defendants accountable for the murder of her husband," as Appellees note, Johnson's current lawsuit demonstrates that Lynette Johnson did not actually rely on the Incident Report in this manner.

[¶31.]     With reference to the fifth element, justifiable reliance, Johnson suggests (though not explicitly)[7] that the action taken in reliance on the Incident Report was not her abstention from suing DOC,[8] but Lynette Johnson's emotional response—that is, Lynette Johnson "took comfort" in reading the Incident Report. As to the sixth element, Johnson directs us to a psychiatric report prepared by Dr. Nathan Szajnberg, who, after conducting a psychological evaluation of Lynette Johnson, concluded that she experienced emotional distress stemming from a sense of betrayal.

---

7.     The circuit court observed that "the Complaint does not allege how Johnson relied upon the Incident Report . . . [and Johnson's] briefing relative to this summary judgment proceeding does not provide any greater clarity." On appeal, Johnson's argument remains unclear.

8.     Appellant argues that while Lynette Johnson eventually learned of the details absent from the Incident Report, she did not initially have any misgivings as to Appellees' truthfulness. But even if Johnson is correct that "[i]f a claim for misrepresentation is negated whenever a person suspects foul play and eventually commences a lawsuit, then no claims would survive summary judgment," Johnson does not furnish any evidence of damages resulting from her temporary choice not to pursue a legal remedy against DOC.

[¶32.]     Appellees argue that Johnson's argument conflates the fifth element's requirement of justifiable reliance with the sixth element's obligation to prove damages resulting therefrom. Not only must Lynette Johnson have believed the Incident Report, but she must also point to some action taken in reliance on the alleged misrepresentation. *See Restatement (Second) of Torts* § 537 (Am. Law Inst. 1977) ("The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, (a) he relies on the misrepresentation in acting or refraining from action, and (b) his reliance is justifiable."). This Johnson has failed to prove. Johnson, moreover, cites no authority—and we can find none—that suggests one's emotional response to an alleged misrepresentation qualifies as an action taken in reliance thereon.

[¶33.]     Johnson counters, however, that it was "inappropriate for the circuit court to grant summary judgment based upon an argument not contained in Defendants' initial brief" made in support of summary judgment. Johnson argues that a party should "not be faulted for failing to extensively brief an element that the Defendants[] did not brief and identify as a basis for summary judgment in the first instance." For this proposition, Johnson cites *Leonhardt v. Leonhardt*, 2012 S.D. 71, 822 N.W.2d 714. *Leonhardt* involved a circuit court's grant of summary judgment on the basis of the statute of frauds, a legal theory discussed at a motions hearing but not raised in summary judgment pleadings. *Id.* ¶ 11. We observed in that case that "a court is not confined to the particular propositions of law advanced by the parties on a motion for summary judgment." *Id.* ¶ 12. Nevertheless, a greater risk for error exists when "the party opposing the summary

judgment motion may be able to show that a genuine issue exists but has not done so because the facts relating to the particular legal principles were not in issue." *Id.* Consequently, "a court should notify the parties when it intends to rely on a legal doctrine or precedent[] other than those briefed and argued by the litigants." *Id.* We held that plaintiffs could not be put on notice of an issue unless it was specifically mentioned or argued in the defendant's pleadings, which defendants in that case failed to do. *Id.* ¶ 13, 822 N.W.2d at 718.

[¶34.]     Appellees contend that the issue of reliance was explicitly raised in their *reply* brief to the circuit court dated April 23, four days before the motion hearing on April 27. Appellees note that Johnson did not object to the issue being raised in a reply brief. Appellees assert that the issue was therefore "argued by the litigants." *Id.* ¶ 12, 822 N.W.2d at 717. Additionally, Appellees observe that Johnson did not request an opportunity to further address the issue, which had been discussed at the motions hearing. Johnson responds that such notice is insufficient if the issue was not raised in the defendants' *initial* brief, citing out-of-state district court decisions and a portion of Justice Sabers' dissent in *Aase v. State, South Dakota Board of Regents*, 400 N.W.2d 269, 275 (S.D. 1987) (Sabers, J., dissenting).

[¶35.]     In his dissent, Justice Sabers argued that summary judgment was inappropriate because the circuit court relied on issues raised by defendants in their reply brief. *Id.* "[Plaintiffs] were under no obligation to presuppose that the trial court would go beyond the rules and consider issues not addressed in the initial summary motion." *Id.* However, in *Aase*, the "first time plaintiffs noticed that the

trial court was considering issues raised in the reply brief was upon receipt of the memorandum opinion." *Id.* "Although summary judgment may be sustained on a ground not mentioned in the motion, the key is whether the parties have had an adequate opportunity to argue and present evidence on that point. If so, then summary judgment may be appropriately entered." 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2719 (4th ed.), Westlaw (database updated April 2017) (footnotes omitted). Here, Johnson was not only aware of the argument made by DOC, but argued at the motions hearing about the various ways in which Lynette Johnson demonstrated reliance on the Incident Report.

[¶36.] Further, "even if the parties did not receive adequate notice of the issue the court relied upon in granting summary judgment, the court's ruling may be affirmed 'if the facts before the . . . court were fully developed so that'" no party suffered any procedural prejudice. *Leonhardt*, 2012 S.D. 71, ¶ 14, 822 N.W.2d at 718 (quoting *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000)). "In other words, 'the failure of the court to provide notice can be excused if the error was harmless under the circumstances.'" *Id.* (quoting *Jaste v. Gailfus*, 679 N.W.2d 257, 261 (N.D. 2004)). "Absent some indication that the moving party might otherwise bring forward evidence that would affect the court's summary judgment determination, failure to provide an opportunity to respond is not reversible error." *Id.*

[¶37.] Johnson does not allege what, if any, evidence could have been produced to the circuit court that would affect its grant of summary judgment. Moreover, unlike in *Aase*, where plaintiffs' motion for an opportunity to provide

additional evidence was denied, 400 N.W.2d at 275, Johnson never made such a motion. Even if the circuit court erred in deciding in part on grounds of reliance, such error was harmless.

[¶38.]        3.      *Whether this Court should recognize in Count 3 a private cause of action for violation of the Due Process Clause found in article VI, § 2 of the South Dakota Constitution for injuries resulting from the Incident Report.*

[¶39.]        Johnson's final argument is that this Court should recognize a private cause of action for violation of her due process rights under the Due Process Clause contained in article VI, § 2 of the South Dakota Constitution. Count 3 of the Complaint, although titled "42 U.S.C. § 1983," does make reference to the South Dakota Constitution. Johnson observes that while we have yet to hold that Article VI, § 2 is self-executing, and that a violation thereof gives rise to a private cause of action for damages, there is authority for such causes in many other jurisdictions. Johnson urges this Court not only to adopt such a private state cause of action, but to define its elements using authority other than the five-part, state-created-danger test utilized by the Eighth Circuit Court of Appeals, which Johnson views as too restrictive.

[¶40.]        The circuit court assessed the viability of such a claim, first noting that South Dakota's Due Process Clause mirrors that of the federal constitution's. *State v. Chant*, 2014 S.D. 77, ¶ 10, 856 N.W.2d 167, 170. The circuit court observed that if a party seeks a different interpretation of parallel textual provisions, they must present some principled distinction justifying expanded protection beyond that provided in the federal constitution. *See id.* Finding that Johnson presented none, and that there was "no apparent expression of unique state concern" with Johnson's

claim, the court concluded that Johnson's present claim was barred by res judicata, noting that there was "little doubt that the judgment of the [federal court] is a final judgment on the merits of [Johnson's] constitutional claim."

[¶41.] We agree. "Res judicata consists of two preclusion concepts: issue preclusion and claim preclusion." *Am. Family Ins. Grp. v. Robnik*, 2010 S.D. 69, ¶ 15, 787 N.W.2d 768, 774. "Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided," and "also is referred to as direct or collateral estoppel." *Id* (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1, 104 S. Ct. 892, 894 n.1, 79 L.Ed.2d 56). "Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit . . . ." *Id* (quoting *Migra*, 465 U.S. at 77 n.1, 104 S. Ct. at 894 n.1). "To invoke the doctrine of res judicata, four elements must be established: (1) a final judgment on the merits in an earlier action; (2) the question decided in the former action is the same as the one decided in the present action; (3) the parties are the same; and (4) there was a full and fair opportunity to litigate the issues in the prior proceeding." *People ex rel. L.S.*, 2006 S.D. 76, ¶ 22, 721 N.W.2d 83, 89-90.

[¶42.] Johnson does not dispute that the federal and state Due Process Clauses are "virtually identical." But Johnson disputes whether there was a full and fair opportunity to litigate the issues in the prior proceeding and whether the question decided in both actions is the same. Johnson points to "new facts that came to light after the [federal] District Court ruled and which it therefore did not

have the benefit of." Johnson points to an affidavit by Robert's cellmate, Michael E. Thomas, stating that between November 2007 and March 2009, Thomas repeatedly warned DOC that Roberts was highly dangerous. Johnson contends that new facts which arise after the prior proceeding bars application of res judicata, relying upon *Lewton v. McCauley*, 460 N.W.2d 728, 731 (S.D. 1990) and *Interest of L.S.*, 2006 S.D. 76, ¶ 50, 721 N.W.2d 83, 97 (Zinter, J., concurring specially).

[¶43.] As Appellees note, neither case "involved the discovery of new evidence concerning a pre-litigation event," and are thus distinguishable. Appellees correctly assert that whether Johnson had a full and fair opportunity to litigate is not determined by "whether it is still possible to find additional evidence concerning that claim." As other courts have held, newly-discovered evidence does not provide an exception to res judicata. *See, e.g.*, *Saud v. Bank of N.Y.*, 929 F.2d 916, 920 (2d Cir. 1991) ("As a general rule, newly discovered evidence does not preclude the application of res judicata."); *Guerrero v. Katzen*, 774 F.2d 506, 508 (D.C. Cir. 1985) ("Although recent Virginia law has not explicitly addressed this issue, we note that newly discovered evidence normally does not prevent the application of res judicata."); *Dreyfus v. First Nat. Bank of Chicago*, 424 F.2d 1171, 1175 (7th Cir. 1970) ("Newly discovered evidence has been held not to prevent the application of res judicata[.]"); *see also* 47 Am. Jur. 2d *Judgments* § 510, Westlaw (database updated December 2016).

[¶44.] Johnson also argues, however, that any effect res judicata might have would only apply to her federal § 1983 claim and not her state Due Process Clause claim, which was not a "question decided" in the federal action. "The test is a query

into whether the wrong sought to be redressed is the same in both actions." *Glover v. Krambeck*, 2007 S.D. 11, ¶ 18, 727 N.W.2d 801, 805 (quoting *Barnes v. Matzner*, 2003 S.D. 42, ¶ 16, 661 N.W.2d 372, 377). Here, the allegation that Johnson was "deprived of rights, privileges and immunities secured by the South Dakota Constitution" is essentially the same as the wrong alleged under her federal § 1983 claim. Importantly, Count 3 of the Complaint itself makes no distinction between the state and federal claims being raised, and Johnson failed to present such distinctions to the circuit court. And as noted above, we also decline to recognize a new private cause of action under the state Due Process Clause based on the facts of this case. Because the two constitutional provisions protect the same scope of rights, the wrong complained of is identical, and review herein is barred by res judicata. *See Clay v. Weber*, 2007 S.D. 45, ¶¶ 13-15, 733 N.W.2d 278, 284-85.

## Conclusion

[¶45.]     The circuit court correctly determined that DOC's conduct in preparing and releasing the Incident Report was not extreme and outrageous, and properly dismissed Johnson's IIED claim. No genuine issues of material fact existed as to Johnson's fraudulent misrepresentation claim, and any error by the circuit court in relying on arguments not presented in DOC's initial brief in support of summary judgment was harmless. The court also correctly determined that res judicata barred any constitutional due process claim arising under the South Dakota Constitution. Therefore, we affirm the court's grant of summary judgment.

[¶46.]     GILBERTSON, Chief Justice, and ZINTER and SEVERSON, Justices, and BARNETT, Circuit Court Judge, concur.

-25-

#27792

[¶47.]        BARNETT, Circuit Court Judge, sitting for WILBUR, Retired Justice, disqualified.