SCOTVOLD, Respondent, v. SCOTVOLD, Appellant

(298 N. W. 266.)

(File No. 8416. Opinion filed May 26, 1941.)

**Bailey, Voorhees, Woods & Bottum** and **M. T. Woods,** all of Sioux Falls, for Appellant.

**Henry C. Mundt,** of Sioux Falls, and **Harold M. East-vold,** of Canton, for Respondent.

SMITH, J.  A husband appeals from a judgment rendered against him in favor of his wife for damages for personal injuries found to have been caused by his negligence in driving an automobile in which she was a passenger.

We deal with two questions presented by the assignments.

First: Is a civil action maintainable in this jurisdiction between husband and wife for damages for personal tort committed by one against the other?  Decision of this question turns upon a determination as to whether the common law rule governing such suits has been abrogated in this state.

Concededly, such an action would not lie at common law. In the leading case of Phillips v. Barnet, 1 Q.B.D. 436, wherein a woman sought recovery from her former husband for assault and battery committed during coverture, Mr. Justice Blackburn said, "I was at first inclined to think, having regard to the old procedure and the form of pleas in abatement, that the reason why a wife could not sue her husband was a difficulty as to parties; but I think that when one looks at the matter more closely, the objection to the action is not merely with regard to the parties, but a requirement of the law founded upon the principle that husband and wife are one person."

Professor William F. McCurdy (Cf. Torts Between Persons in Domestic Relations, 43 Harvard Law Review, 1030) suggests that the orthodox expression "merger of legal identity of the spouses" is at most a useful phrase to sum up a result, and explains very little.  After reviewing the incidents of coverture at common law, including the rights accruing to the husband in the property of the wife, his right to reduce her choses of action to his possession, his liability for her torts, and her incapacity to make contracts for herself, to convey her property, and to sue and be sued in her

own name without joining her husband, he advances the following explanation of the common law rule:

"A combination of all these incidents made it impossible at common law for one spouse ever to be civilly liable to the other for an act which would be a tort if the relation did not exist. Where the act occurred before marriage, a cause of action arose. If the man was the tort-feasor, the woman's right would be a chose in action, which upon marriage the man would have the right to reduce to possession. This union in one person of the right-duty relation discharges the duty as a matter of substance, and there is besides the procedural difficulty that the husband would be both plaintiff and defendant. If the woman was the tort-feasor, the man's right would be a chose in action against the woman, whose duty upon marriage would devolve upon the husband . as a derivative duty, which would be discharged by union of the right and duty in the same person; and there is the same procedural difficulty. Where the act occurs during coverture, the matter is complicated by other factors. In the case of an act affecting property, because of the rights which a husband acquires by marriage in the property of his wife there is only one case where it could be contended that an act by him could be a tort as a matter of substance: waste upon the wife's realty. Where the wife is the actor dealing with the husband's property, these considerations of property right are not applicable, but doubtless in many cases there would exist, because of the relation of the parties, an express or implied consent of the husband which would prevent the conduct from being wrongful. In some cases, however, the conduct of the wife may be against the will of the husband, or may amount to such an assumption of dominion as to destroy any implication of consent. Nevertheless, the right and the duty to make compensation, if any can be said to exist, would be united eo instante in the same person, and no cause of action could arise; and even if it could be said to arise, there would be the procedural difficulty of the husband's being both plaintiff and defendant. The same reasoning would apply to acts which injure the person, whether done by husband to wife or by

wife to husband, and, in addition, if the husband is the actor, his right to services and earnings and his duty to support would prevent an injury from causing the wife pecuniary loss."

The first legislative changes in these incidents of coverture came in 1866. In January of that year the Territorial Legislature adopted the Civil Code. It provided that (with certain limited exceptions) neither husband nor wife has any interest in the property of the other (§ 78); that either husband or wife may enter into any engagement or transaction with the other, or with any other person, respecting property, which either might if unmarried (§ 79); that a husband and wife may hold real or personal property together, jointly or in common (§ 82); that neither husband nor wife, as such, is answerable for the acts of the other (§ 83); and that a conveyance by a married woman has the same effect as if she were unmarried (§ 522). These provisions continue in our law as a part of SDC 14.02.

Then by Chapter 98 of the Session Laws of 1887, it was provided: "That from and after the passage of this act, woman shall retain the same legal existence and legal personality after marriage as before marriage and shall receive the same protection of all her rights as a woman, which her husband does as a man; and for any injury sustained to her reputation, person, property, character or any natural right, she shall have the same right to appeal in her own name alone to the courts of law or equity for redress and protection that her husband has to appeal in his own name alone; * * *."

The foregoing provision was codified as § 2600, C. L. 1887, and was thereafter revised and appeared as § 105, Rev. Civil Code of 1903, in words as follows: "The wife shall have and retain after marriage all the civil and property rights of a single woman. She may buy and sell, receive and convey or otherwise dispose of any real or personal property belonging to her or in which she may have an interest, without joining the name of her husband except as otherwise provided in case of the homestead and for any injury to her

reputation, person or property, she may sue in her own name without joining her husband as party plaintiff and in like manner actions founded upon her separate contracts or torts or relating to her individual property may be brought against her without joining the husband as party defendant. * * *"

This section now appears as SDC 14.0207 and is the particular statute upon which the wife predicates her right to maintain this action.

This legislation must be interpreted in the light of certain fixed principles. While the common law is in force in this jurisdiction except where changed by statute or by other expression of the sovereign will, SDC 65.0103, the rule of strict construction of statutes in derogation of common law does not obtain in this state. Our function is to effectuate the legislative purpose through liberal construction. SDC 65.0202.

Before we analyze the precise contention of the husband, we pause to state certain more or less obvious conclusions which arise from reading this group of statutes. Obviously this legislation deals with more than the mere right of the wife to sue and be sued in her own name. It makes sweeping changes in her substantive rights. By these changes she emerges as a legal personality with the civil rights of the ordinary person. Among those civil rights with which she is clothed by these statutes is the right to protection from bodily harm. SDC 47.0301. That a wrongful invasion of any of these civil rights gives rise to a cause of action in the wife, is the basis of the holding of this court in Moberg v. Scott, 38 S. D. 422, 161 N. W. 998, L.R.A. 1917D, 732.

However the husband, in substance, says that granting all of the foregoing conclusions, SDC 14.0207 supra does not reveal a legislative intent to grant remedies between husband and wife. It was enacted, says the husband, to place the wife on a plane of equality with the husband in relation to third persons. It is this contention we now consider.

When these statutes are examined to determine the rights and capacities of a married woman, the conclusion

is impelled that their cumulative effect is to declare her a legal individual with the right to own and control her own property, including property held with the husband as in common or as joint tenants, and to enter into contracts with others, including her husband. It seems improbable that the Legislature which created such separate civil and property rights, and made possible such transactions between husband and wife, could have intended that one should be without remedy if the other wrongfully invaded those individual property rights or refused to abide by the terms of their mutual engagements. To sustain the husband's contention would require us to hold a wife without remedy at law if the husband breached his contract or so invaded her property rights. We are unable to discern a basis for a holding that the wife has a remedy against her husband for breach of contract or for invasion of property rights but is without a remedy against him for a personal tort. Either the statute grants sweeping remedies to the wife as against her husband, or none. We think it intended to grant the wife rights and remedies as against the world.

██ More conclusive considerations remain to be stated. As no statute provides that a civil action for personal tort shall not be maintained between husband and wife in this state, before the contention of the husband may be sustained, we must be satisfied that the rule of the common law upon which he relies has not been abrogated. We have seen that that rule rested upon a combination of the incidents of coverture figuratively described as "unity of the spouses." That this fiction "is meeting with constantly diminished recognition" and is not "in all respects logically defensible" was noted by this Court in Springer v. Swift, 59 S. D. 208, 239 N. W. 171, 176, 78 A.L.R. 1171. We have now concluded that it cannot be defended. Under a system of law which has stripped the husband of every vestige of common law right in the ownership and control of the property of his wife, and which has completely clothed the wife with civil personal and property rights, as well as with capacity to convey, contract and to sue and to be sued alone, no basis remains for a rule resting on the fiction that the legal per-

sonality of the two are merged in that of the husband. That notwithstanding this change of status, substantive reasons may exist, founded upon implied consents incident to the marriage relation, which will defeat causes of action which might arise except for that relation, we have no doubt. However, we are impelled to the conclusion that the common law rule for which the husband contends was effectively abrogated by the statutes which destroyed the incidents of coverture from which it sprang.

It is suggested that a sound public policy which seeks to foster and nurture the sacred marriage relations commands us to hold the portals of our courts closed to this character of litigation. There is nothing to indicate that the Legislature did not intend the full measure of the change it has wrought. Such being the case, we deem that which was said by Mr. Justice Harlan in his much cited dissent in Thompson v. Thompson, 218 U. S. 611, 31 S. Ct. 111, 113, 54 L. Ed. 1180, 30 L.R.A., N.S., 1153, 21 Ann. Cas. 921, as particularly applicable: "In my opinion these statutory provisions, properly construed, embrace such a case as the present one. If the words used by Congress lead to such a result, and if, as suggested, that result be undesirable on grounds of public policy, it is not within the functions of the court to ward off the dangers feared or the evils threatened simply by a judicial construction that will defeat the plainly-expressed will of the legislative department."

Similar questions have been before other courts under a wide variety of statutes. The sharp conflict of opinion may not be wholly explained because of dissimilarity of the provisions construed. The cases are collected in 6 A.L.R. 1038; 29 A.L.R. 1482; 33 A.L.R. 1406; 44 A.L.R. 794; 48 A.L.R. 293; and 89 A.L.R. 118.

The views we have expressed find support in Brown v. Brown, 88 Conn. 42, 89 A. 889, 52 L.R.A., N.S., 185, Ann. Cas. 1915D, 70; Bushnell v. Bushnell, 103 Conn. 583, 131 A. 432, 44 A.L.R. 785; Fiedler v. Fiedler, 42 Okl. 124, 140 P. 1022, 52 L.R.A., N.S., 189; Johnson v. Johnson, 201 Ala. 41, 77 So. 335, 6 A.L.R. 1031; Fitzpatrick v. Owens, 124 Ark.

167, 186 S. W. 832, 187 S. W. 460, L.R.A. 1917B, 774, Ann. Cas. 1918C, 772; Fitzmaurice v. Fitzmaurice, 62 N.D. 191, 242 N. W. 526; Wait v. Pierce, 191 Wis. 202, 209 N. W. 475, 210 N. W. 822, 48 A. L. R. 276 (noted in 11 Minn. Law Review 79); and by the dissenting opinion of Mr. Justice Harlan, in which he was joined by Mr. Justice Holmes and Mr. Justice Hughes, in Thompson v. Thompson, supra.

Was plaintiff, in point of law, a guest of defendant without payment for her transportation as provided by Chapter 147 of the Session Laws of 1933 (SDC 44.0362)? The question arises under error predicated upon a motion to direct, and a motion for judgment n.o.v.

The pertinent portion of the statute reads "* * * No person transferred [sic.] by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident shall have been caused by the gross negligence or wilful and wanton misconduct of the owner or operator of such motor vehicle and unless such gross negligence or wilful and wanton misconduct contributed to the injury, death or loss for which the action is brought."

Stated in the light most favorable to plaintiff the evidence disclosed the following facts: Plaintiff and defendant are wife and husband and maintain their family home at Minneapolis, Minnesota. For about sixteen years prior to the time in question the defendant had been employed as a traveling evangelist of the Norwegian Lutheran Church of America. He received a salary and expenses and drove his own car while engaged in his employment. His meetings were carried on pursuant to invitations from local pastors or congregations, and except for some consultation with the president of the Church, defendant arranged his own itinerary and program.

Although she was under no contract with either the Church or the defendant so to do, for a number of years plaintiff had accompanied defendant and had assisted in

his work by handling overflow groups, offering prayer, giving testimony, conferring with women and girls with reference to their spiritual problems, teaching Bible classes, doing light housekeeping in an apartment, and in numerous other ways. In speaking of her assistance to defendant, plaintiff testified "He wants me to do this in order that his evangelistic work might have more success, and we could do more in the Kingdom of God."

Prior to the time in question, arrangements had been made to conduct a series of meetings at Rolfe, Iowa, during the week commencing on Sunday, the 18th day of September, 1938. Pursuant to a statement of defendant that "she was more effective than he" in dealing with the women, plaintiff, rather against her wishes, had agreed to accompany defendant. It was intended by plaintiff and defendant that she would render her customary assistance at Rolfe.

On the day before they left Minneapolis for Rolfe, defendant received word of the death of the wife of a cousin of his, and that the funeral would be held near Centerville, South Dakota, on Monday, September 19, 1938. The cousin and wife were members of defendant's denomination, and the funeral was to be held in their local church. Although it does not appear that he had been invited so to do, or instructed by any officer of his employer so to do, defendant made up his mind to speak at the ceremony. Before leaving Minneapolis he said to plaintiff "This will be a good time to further the cause we are aiming at, because of that group of people there that he could preach to, that otherwise would be hard to get to a meeting," and he further said "If you go there and take part we will,—our objective would be greatly furthered at that place" and he further told plaintiff to "use every opportunity to take part in the meeting in whatever way."

Plaintiff and defendant left Minneapolis on Saturday, the 17th of September, according to plan, opened their meetings at Rolfe on Sunday, and early Monday traveled a distance of approximately 150 miles over into South Dakota to attend the last rites above described. At that ceremony de-

fendant read a text and preached a sermon, and plaintiff quoted Scripture and offered prayer. The part plaintiff took in the service was pursuant to a request of the local minister communicated to her husband after they arrived in South Dakota.

The unfortunate accident in which plaintiff suffered serious and permanent injuries occurred Tuesday forenoon as the parties were attempting to return to Rolfe, Iowa.

We assume the negligence of defendant was the proximate cause of plaintiff's injuries. That defendant's conduct may not be characterized as "gross negligence or wilful and wanton misconduct" as that phrasing is interpreted by Melby v. Anderson, 64 S. D. 249, 266 N. W. 135, 136, is not questioned.

■■ The statute we are to interpret does not deal with all motor vehicle passengers. Among those who ride in such vehicles of whom the statute makes no mention are servants, employees, and others who are not guests. It obviously seeks to classify those who ride as guests, and to differentiate between those who are such in the primary sense of the term, viz., through the promptings of friendship or relationship, and those who are guests in a secondary sense, in that their transportation was induced by more practical considerations. A literal interpretation, because of the use of the word, "payment", and the sense in which that word is understood in common parlance, would result in dividing "guests" into those who are, and those who are not, expected to render something unto the owner or operator in fulfillment of a promise, or in the nature of a quid pro quo. However, looking at those who make up the class we call passengers, and speculating as to the purpose which caused the law-making body in considering the proposed legislation to first differentiate, in its thought, between guests and non-guests, and then between different types of guests, it seems clear that such a literal interpretation would outrun the legislative purpose. As we have indicated in the first phase of this opinion, we are obligated to indulge in a liberal interpretation to effectuate the purpose of the Legislature.

■ In his relation to the owner or operator of the motor vehicle, one who has become a passenger for the substantial benefit of such owner or operator has much more in common with the passenger for pay, the servant, the employee, agent, etc., than with one who is a guest in the primary sense. Therefore we are led to conclude that no conceivable consideration which could have operated to induce the Legislature to bar a true guest from acquiring a cause of action for that which, in the absence of a more convenient term, we call "ordinary negligence" against his host, while permitting such a cause to arise in favor of a paid guest, a servant, employee, etc., could at the same time have generated an intention to bar recovery for such negligence by a passenger whose trip was motivated by a mutual expectation of substantial benefit to the owner or operator. Our conclusion that the statute in question did not intend to bar recovery by such an one was indicated in Schiltz v. Picton, 66 S. D. 301, 282 N. W. 519, and has been confirmed by the adoption of the section in substantially unchanged form by the Code of 1939, SDC 44.0362.

However, we entertain the view that no basis exists for differentiating such a guest from the true guest the Legislature had in mind unless the benefit he is to bestow on the owner or operator is sufficiently real, tangible and substantial to serve as the inducing cause of the transportation, and to operate to completely overshadow any considerations of mere hospitality growing out of friendship or relationship.

The words "guest without payment for such transportation" appear in the guest statute of several other states, as descriptive of the class barred from acquiring a right of action against the owner or operator for "ordinary negligence." By almost a consensus of judicial opinion it is held that the phrase should not be interpreted as including passengers who have become such for the substantial benefit of the owner or operator. Peronto v. Cootware, 281 Mich. 664, 275 N. W. 724; Cardinal v. Reinecke, 280 Mich. 15, 273 N. W. 330, 274 N. W. 379; Goldberg v. Cook, 206 Minn. 450, 289

N. W. 512; Kruy v. Smith, 108 Conn. 628, 144 A. 304; Albrecht v. Safeway Stores, 159 Or. 331, 80 P.2d 62; Scholz v. Leuer, Wash., 109 P.2d 294; Annotations 82 A.L.R. 1365, 95 A.L.R. 1180.

With this construction of the statute in mind, we turn to a consideration of the relation of plaintiff as a passenger in her husband's automobile at the time in question.

At the outset, we conclude that in determining the status of plaintiff, we must exclude from consideration anything which she had done, or proposed to do for her husband at Rolfe, Iowa. The transportation in process at the time of plaintiff's injury was for the purpose of permitting attendance upon the services at Centerville. That which plaintiff had done elsewhere but serves to indicate her capacity for assisting her husband, and thus to paint a background to aid in determining whether her trip to Centerville was made as a wife and companion, or to bestow a tangible and substantial benefit on her husband.

The nature of the benefit it is said plaintiff bestowed on defendant, and its relation to her presence in defendant's car at the time of the fateful accident, can best be judged if viewed as of the time of their departure from Rolfe.

As to defendant, it appears that he was going to Centerville under an assumption that an invitation would be forthcoming which would permit him to have some part in the last rites to be conducted for this relative by marriage. It may also be inferred that he intended to use whatever opportunity the occasion afforded to further the cause to which he had dedicated his life.

As to the plaintiff, it is fair to presume that she stood ready to comply with her husband's request and take part in the forthcoming ceremonies. However, with her husband and the local minister available, it must have been apparent to both of them that the possibility of a part being assigned to her was at least somewhat remote. Further, they were not going to Centerville to conduct a revival meeting with its train of opportunities for an assistant to 'lighten the burden of the evangelist. The scope of the prospective

68 S. D.—3

activities of both parties was necessarily limited by the character of the occasion. We discover no reason for inferring that they could have anticipated that she would have opportunity to do more than that which she actually did, viz., quote Scripture and offer a prayer.

Further, the proposed trip must be viewed from another aspect. Husband and wife were at Rolfe, away from home. He found it necessary to make a trip to Centerville. The fact that his wife accompanied him, and did not remain at Rolfe, accords with the normal flow of married life.

■ The situation may not be stated in a light more favorable to plaintiff, and in our opinion such evidence will not support a finding that the transportation of plaintiff was induced by the bare possibility that she might be able to offer a prayer at the service, or that such a prospective prayer was then looked upon by the parties as of substantial benefit to defendant. As has been recently well said, such a finding "would transcend reality." Dibble v. Harper's Estate, 294 Mich. 453, 293 N. W. 715.

To summarize, we conclude: First, that a civil action is maintainable in this jurisdiction between husband and wife for damages for personal tort committed by one against the other; second, that in point of law, plaintiff was a "guest" of her husband, "without payment for such transportation" and therefore acquired no cause of action against him.

It follows that the judgment of the trial court must be and is, reversed, and the cause is remanded with directions to enter judgment dismissing the complaint on its merits.

All the judges concur.