#27754, #27775-r-JMK

**2017 S.D. 92**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

SALLY RICHARDSON,                    Plaintiff and Appellant,

    v.

MICHAEL RICHARDSON,                  Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT GUSINSKY
Judge

* * * *

ROBERT D. PASQUALUCCI
Rapid City, South Dakota              Attorney for plaintiff
    and appellant.


TIMOTHY RENSCH of
Rensch Law Office
Rapid City, South Dakota              Attorneys for defendant
    and appellee.


* * * *

ARGUED OCTOBER 3, 2016
REASSIGNED ON
SEPTEMBER 8, 2017
OPINION FILED **12/27/17**

#27754, #27775

KERN, Justice (on reassignment)

[¶1.] Sally Richardson alleged that her husband Michael forced her to work as a prostitute during the course of their marriage. Sally also alleged that Michael emotionally, physically, and sexually abused her, causing both humiliation and serious health problems. Sally divorced Michael on the grounds of irreconcilable differences, reserving by stipulation the right to bring other nonproperty causes of action against him. Following the divorce, Sally brought suit against Michael, alleging intentional infliction of emotional distress (IIED). The court, bound by our precedent in *Pickering v. Pickering*, 434 N.W.2d 758, 761 (S.D. 1989), dismissed Sally's suit for failing to state a claim upon which relief can be granted. We take this opportunity to overrule *Pickering* and reverse and remand the court's order dismissing Sally's suit.

## Facts and Procedural History

[¶2.] The circuit court did not hold any evidentiary hearings or make any findings of fact. Because the court dismissed the claim pursuant to Rule 12(b)(5), we reiterate the facts set forth in Sally's complaint.[1] In 2013, Sally worked as a part-time escort. In February, Michael solicited Sally by phone, but the two did not arrange a meeting. In May 2013, Sally met Michael at a Walmart in Rapid City, South Dakota, by happenstance. By then, Sally had ceased working as an escort. Michael did not initially recognize her as the woman he had solicited in February.

---

1. Because "[a] motion to dismiss under SDCL 15-6-12(b) tests the legal sufficiency of the pleading, not the facts which support it," *Mordhorst v. Dakota Truck Underwriters and Risk Admin. Servs.*, 2016 S.D. 70, ¶ 8, 886 N.W.2d 322, 323, we restate the facts as pleaded and alleged in the complaint.

After talking, the two decided to schedule a date. Ultimately, Sally and Michael began a romantic relationship.

[¶3.]    During their relationship, Michael recognized Sally as the person he had once solicited, and Sally disclosed her past as an escort. In response, Michael wanted Sally to continue working as an escort. He provided her a cellphone and business cards and began prostituting her online through various websites. Michael also drove Sally to her appointments and watched her liaisons with clients through a laptop or iPad.

[¶4.]    Michael became physically and verbally abusive toward Sally early on in the relationship. He repeatedly threatened to kill Sally or himself, and in January 2014, Michael attempted suicide. Despite continually claiming Sally could stop working as an escort in six months' time, Michael became violent whenever she proposed quitting. Law enforcement received numerous 911 calls reporting domestic abuse. In May 2014, despite Michael's abusive treatment, Sally married Michael. According to Sally, she still cared for Michael and wanted to make the relationship work. However, Sally claimed she continually lived in fear for her life and developed Post-Traumatic Stress Disorder.

[¶5.]    In addition to physical and verbal abuse, Michael sexually abused Sally. He demanded she engage in infantilizing conduct. Further, Michael forced Sally to perform unsafe and demeaning sexual acts against her will. Because of this mistreatment, Sally suffered life-threatening health complications.

[¶6.]    In September 2014, the two separated. Michael filed for divorce citing irreconcilable differences, and Sally counterclaimed for divorce based on adultery,

extreme cruelty, and habitual intemperance. The parties ultimately settled and divorced on grounds of irreconcilable differences. The settlement agreement contained a mutual release; however, it provided an exception permitting either party to pursue nonproperty causes of action against the other. In April 2015, a decree of divorce was granted.

[¶7.] Approximately four months after the divorce, Sally sued Michael for IIED. The complaint alleged that Michael engaged in "extreme and outrageous conduct" and "intentionally and recklessly force[d] . . . [Sally] to continue in prostitution against [her] wishes . . . caus[ing] [Sally] severe emotional distress." Michael moved to dismiss for failure to state a claim and moved for summary judgment in the alternative. Michael's motion cited *Pickering* and asserted that *Pickering* bars former spouses from suing each other for IIED when the claim is based on conduct that served as the basis for the parties' divorce.

[¶8.] On January 12, 2016, the circuit court held a hearing on Michael's motion to dismiss. The court acknowledged the severity of Michael's alleged conduct, stating, "If true, what went on here is despicable, outrageous, and the court can't find strong enough words to condemn [it]." Nevertheless, the court observed that *Pickering*, as a matter of public policy, prohibited "causes of action predicated on conduct which leads to the dissolution of marriage, even if such conduct is severe." *See* 434 N.W.2d at 761. The circuit court granted Michael's motion to dismiss for failure to state a claim under SDCL 15-6-12(b)(5). Sally appeals,

arguing the circuit court erred in determining she failed to state a claim upon which relief may be granted.[2]

## Analysis and Decision

[¶9.]        Sally argues that the circuit court erred in relying on *Pickering* to dismiss her case.[3]  Sally contends that *Pickering* does not control this case because the facts in *Pickering* and the case it cites as support, *Richard P. v. Superior Court (Gerald B.)*, 249 Cal. Rptr. 246 (Cal. Ct. App. 1988), involved extramarital affairs that resulted in the birth of children out of wedlock.  *See Pickering*, 434 N.W.2d at 761-62.  In her view, Michael's conduct warrants a different rule because of its abusive nature.  Further, Sally observes that the Legislature previously abolished the common-law doctrine of interspousal immunity and permitted tort suits between spouses.  Therefore, she claims that *Pickering* is inconsistent with this abrogation.  *See Scotvold v. Scotvold*, 68 S.D. 53, 298 N.W. 266, 272 (1941) ("[A] civil action is maintainable in this jurisdiction between husband and wife for damages

---

2.     Although the parties cited irreconcilable differences as the grounds for their divorce, the circuit court considered an email not a part of the pleadings as an admission that the pleaded conduct led to the divorce.  Michael filed a notice of review on this issue, arguing the court erred by considering matters outside the pleadings.  In the alternative, Michael submits that affirmance is still warranted even if a Rule 12(b)(5) dismissal was technically unavailable because the circuit court should also have granted his motion for summary judgment.  The only matter the circuit court considered outside the pleadings involved the undisputed assertion that the pleaded conduct led to the divorce.  Although the complaint does not specifically make that assertion, Sally's arguments to the circuit court and here are predicated on that assertion.  Therefore, we treat that assertion as a pleaded fact for purposes of our analysis.  Further, because we reverse and remand, we do not reach the summary judgment question raised by the notice of review.

3.     We review a dismissal for failure to state a claim de novo.  *Nooney v. Stubhub, Inc.*, 2015 S.D. 102, ¶ 9, 873 N.W.2d 497, 499.

for personal tort committed by one against the other . . . ."). Sally urges this Court to abandon its reliance on *Pickering* and join the many other states that permit a suit for tortious conduct occurring within the marriage.

[¶10.] In *Pickering*, a woman became pregnant during an extramarital affair. When she exhibited signs of pregnancy, she fooled her husband into believing he fathered the child. The husband eventually learned of the deception and filed for divorce. The husband also sued his estranged wife and her paramour for their deceitful conduct, alleging a variety of causes of action, including IIED. The circuit court granted the wife summary judgment, and this Court affirmed, holding that "the tort of [IIED] should be unavailable as a matter of *public policy* when it is predicated on conduct which leads to the dissolution of a marriage." *Pickering*, 434 N.W.2d at 761 (emphasis added). While the facts of Sally's case may be distinguishable from the facts in *Pickering*, *Pickering's* broad holding makes no exception for a case such as hers.

[¶11.] Distilled to its core, this case comes down to a single question: Should we uphold the judicially created rule in *Pickering*? We think not. *Pickering* is ripe for reexamination for a number of reasons. We observe that in deciding whether to overturn long-standing precedent, our decision in *State v. Plastow* examined: (1) whether the rule is "no longer necessary to achieve [its] valid purposes"; (2) whether "the rule may operate to obstruct justice"; and (3) decisions of other courts. 2015 S.D. 100, ¶¶ 15-17, 873 N.W.2d 222, 227-29. Based in part on these criteria, we adopted a new rule because the old rule was "too rigid in its approach, too

narrow in its application, and too capable of working injustice[.]" *Id.* ¶ 19, 873 N.W.2d at 229. So, too, is the rule in *Pickering*.

[¶12.]     Here, in determining whether the *Pickering* rule serves a valid purpose, we note that before this Court decided *Pickering*, a victim could sue his or her spouse for IIED because the Legislature abolished interspousal tort immunity. *Pickering*, 434 N.W.2d at 763. Interspousal tort immunity is a common-law rule that arose from the doctrine of coverture, which only allowed a married woman to sue through the personality of her husband. *Immunity*, Black's Law Dictionary (10th ed. 2014). Common law held that the unity of spouses created a "merger of legal identity[.]" *Scotvold*, 68 S.D. 53, 298 N.W. at 267 (quoting William F. McCurdy, *Torts Between Persons in Domestic Relation*, 43 Harv. L. Rev. 1030, 1035 (1930)). Thus, before the Legislature abolished interspousal immunity, it was "impossible at common law for one spouse ever to be civilly liable to the other for an act which would be a tort if the relation did not exist." *Scotvold*, 68 S.D. 53, 298 N.W.2d at 267 (quoting McCurdy, *supra*, at 1033). But the majority of states have long since abandoned this antiquated doctrine. "[Interspousal tort immunity] was abolished by seven jurisdictions between 1914 and 1920, eroded gradually in the ensuing fifty years, and has been transformed dramatically from a majority to a minority rule since 1970." Carl Tobias, *Interspousal Tort Immunity in America*, 23 Ga. L. Rev. 359, 359 (1989).

[¶13.]     In 1941, we first recognized the Legislature's abrogation of interspousal tort immunity in *Scotvold*. 298 N.W. at 272. We reached this conclusion by analyzing the statutes enacted by the Territorial Legislature and then

the State Legislature. *Id.* at 268. These laws affirmatively recognized that married

persons have separate legal identities complete with all the accompanying rights.

*Id.* The Legislature's enactments led this Court to reiterate "certain more or less

obvious conclusions":

> Obviously this legislation deals with more than the mere right of
> the wife to sue and be sued in her own name. It makes
> sweeping changes in her *substantive rights*. By these changes
> she emerges as a legal personality with the civil rights of the
> ordinary person. Among those civil rights with which she is
> clothed by these statutes is *the right to protection from bodily
> harm*.

*Id.* (emphasis added).

[¶14.]     The Legislature thus acknowledged the right of married persons to sue

in their own name. As we stated in *Scotvold*, this right is not merely procedural,

but *substantive*, and it offers protection to married persons. *Id.* The Legislature

has codified this right. *See* SDCL 25-2-15 (setting forth a married person's right to

sue in his or her own name); *Aus v. Carper*, 82 S.D. 568, 574, 151 N.W.2d 611, 614

(1967) ("[T]he [L]egislature indicated an intention to place married women in the

same legal status as other persons, including actions and claims against her

husband.").

[¶15.]     Although *Pickering* acknowledged that interspousal immunity in tort

actions had been abolished, the Court did not create its rule based on that doctrine.

*See* 434 N.W.2d at 763. Rather, it grounded its rule in "public policy." *Id.* at 761.

But in effect, *Pickering* arbitrarily precluded tort relief for conduct that occurred

during a marriage that later served as grounds for divorce.[4] The rule operates to obstruct justice and contravene the Legislature's determination that married persons have a substantive right to sue for redress and protection from harm.

[¶16.] Although this Court has the power to declare public policy, as it did in *Pickering*, it shares that power with the Legislature, and such power is subject to the South Dakota Constitution. *Dahl v. Combine Ins. Co.*, 2001 S.D. 12, ¶ 8, 621 N.W.2d 163, 166. Further, the Legislature "is closest to and best represents the people." *Indep. Cmty. Bankers Ass'n of S.D., Inc. v. State ex rel. Meierhenry*, 346 N.W.2d 737, 745 (S.D. 1984). Accordingly, exertions of judicial rulemaking based on public policy must be mindful of the Legislature's public policy determinations and avoid overreach. "[W]e are not legislative overlords empowered to eliminate laws whenever we surmise they are no longer relevant or necessary." *Sanford v. Sanford*, 2005 S.D. 34, ¶ 23, 694 N.W.2d 283, 290. "Public policy safeguards 'that which the community wants' and not 'that which an ideal community ought to want.' Therefore, 'until firmly and solemnly convinced that an existent public policy is clearly revealed, a court is not warranted in applying the principle under consideration.'" *AMCO Ins. Co. v. Emp'rs Mut. Cas. Co.*, 2014 S.D. 20, ¶ 10, 845 N.W.2d 918, 922 (quoting *Barton v. Codington Cty.*, 68 S.D. 309, 322, 2 N.W.2d 337, 343 (1942)).

---

4. The grounds for divorce are set forth in SDCL 25-4-2 are: adultery, extreme cruelty, willful desertion, willful neglect, habitual intemperance, conviction of felony, and irreconcilable differences.

[¶17.] In *Sanford v. Sanford*, we discussed *Veeder v. Kennedy*, 1999 S.D. 23, 589 N.W.2d 610, a decision in which we refused to abolish the tort of alienation of affections because "its source was a *statute*, *not case law*":

> The "public policy" argument of Kennedy cannot be supported by our system of law. SDCL 1-1-23 states that the sovereign power is expressed by the statutes enacted by the legislature. SDCL 20-9-7 which authorizes Michael's cause of action in this case is such a statute. *Under SDCL 1-1-24 the common law and thus an abrogation of the common law are in force except where they conflict with the statutory will of the legislature as expressed by SDCL 1-1-23.* We are unable to locate a single case in this jurisdiction where this Court has struck down a statute as a violation of public policy. As no constitutional defects are claimed by Kennedy, *we are compelled to leave the cause of action intact and instead defer to the legislature's ability to decide if there is a need for its elimination.*

2005 S.D. 34, ¶ 23, 694 N.W.2d at 290 (quoting *Veeder*, 1999 S.D. 23, ¶ 23, 589 N.W.2d at 616) (emphasis added). *Pickering* made the mistake that *Sanford* and *Veeder* warned against. *Pickering* did not "defer to the [L]egislature's ability" to decide whether to eliminate a right granted by statute. *Id.*; *see also* SDCL 25-2-15 (setting forth a married person's right to sue in his or her own name). We, too, should have felt "compelled to leave the cause of action [for IIED] intact," thereby preserving the substantive right the Legislature granted to married persons. *Sanford*, 2005 S.D. 34, ¶ 23, 694 N.W.2d at 290.

[¶18.] Further, while *Pickering* addressed several causes of action, the reasoning it devoted to IIED is sparse. Indeed, the cupboard is bare when it comes to justifications for *Pickering*'s IIED holding—the entire rationale is summed up in a single paragraph:

> We first address the trial court's granting summary judgment in favor of Jody and Tom on the cause of action alleging [IIED].

> We believe the tort of [IIED] should be unavailable as a matter of public policy when it is predicated on conduct which leads to the dissolution of a marriage. Furthermore, the law of this state already provides a remedy for this type of claim in the form of an action against the paramour for alienation of affections.

*Pickering*, 434 N.W.2d at 761 (internal citations omitted). Before stating its holding, there is no explanation of *why* the tort of IIED should be unavailable when it is predicated on conduct that led to the dissolution of a marriage. Moreover, while *Pickering* deemed a cause of action for IIED unnecessary because an alternative remedy existed in "the form of an action against the paramour for alienation of affections," *id.*, there are at least two problems with this justification. First, the existence of multiple applicable causes of action does not justify a rule eliminating a cause of action. In other contexts, our law does not needlessly winnow down the victim's potential remedies when a tortfeasor commits multiple torts against the victim. Second, this justification is unpersuasive under the facts of this case: Sally has no alternate remedy because her husband was her abuser.

[¶19.] The *Pickering* majority also considered the justification of interfamilial warfare, albeit in the context of the plaintiff's other action for fraud and deceit. The majority stated that these too "should be barred as a matter of public policy" because "the subject matter of this action is not one in which it is appropriate for the courts to intervene[.]" *Pickering*, 434 N.W.2d at 761. The majority stated that "[a]llowing [the plaintiff] to maintain his cause of action may cause [his] daughter significant harm. This innocent party, who is now three years old, should not be

subjected to this type of 'interfamilial warfare.'" *Id.*[5] Justice Henderson's concurrence in *Pickering* explicitly adopted the interfamilial warfare reasoning from *Richard P.* and applied it to IIED:

> In my opinion, where man and wife are involved in a marriage relationship, there could always exist a tort for [IIED] where they had an argument. It could be over the family dog, who takes out the garbage, who forgot to pay the bill, or who is spending too much money. In other words, the laws should not provide a basis for *interfamilial warfare* between husbands and wives where our courts would be flooded with litigation.

*Id.* at 764 (Henderson, J., concurring in part, dissenting in part) (emphasis added).

[¶20.] Although our prior opinions referencing the *Pickering* rule have also adopted the interfamilial warfare rationale regarding IIED, *see State Farm Fire & Cas. Co. v. Harbert*, 2007 S.D. 107, ¶ 14, 741 N.W.2d 228, 233; *Henry v. Henry*, 534 N.W.2d 844, 846 (S.D. 1995), *Pickering*'s broad holding barring claims of IIED does not expressly rely on this justification. Rather, it appears that the Court in *Pickering* was concerned with the fact that a three-year-old child would be subjected to the turbulence resulting from her parents' lawsuit. *Id.*, 434 N.W.2d at 762. But

---

5. It is worth noting that in the case *Pickering* cites in support of this proposition, *Richard P. v. Superior Court (Gerald B.)*, 249 Cal. Rptr. 246 (Cal. Ct. App. 1988), the California Legislature had passed legislation supportive of *Richard P.*'s policy determination: "Richard contends that the action herein is barred by Civil Code section 43.5, sometimes referred to as 'anti-heart balm' legislation . . . which provides as follows: 'No cause of action arises for: (a) Alienation of affection. (b) Criminal conversation. (c) Seduction of a person over the age of legal consent. (d) Breach of promise of marriage.'" *Id.* at 248-49 (internal citations omitted). While the court in *Richard P.* did not base its decision on the referenced statute, it surely played a role in the court's assessment of California's public policy. Critically, the South Dakota Legislature has not adopted similar legislation and in fact maintains the tort of alienation of affection. *See Veeder v. Kennedy*, 1999 S.D. 23, 589 N.W.2d 610.

if this justification is sufficient to deny a harmed spouse his or her remedy, why does the Legislature permit litigation between people with children at all? The familial difficulties that a child would face if her parents were on opposite sides of an IIED action are similar to the difficulties faced in any other suit not barred by public policy and in any divorce or custody proceeding. Further, Sally and Michael have no children. Thus, if familial tranquility is the goal of the *Pickering* rule, it is overbroad and unattainable.

[¶21.] Likewise, the *Pickering* rule does not promote marital harmony. Public policy favors the bedrock institution of marriage and seeks to nourish and foster the marital relationship. The specific holding in *Pickering* is that "the tort of [IIED] should be unavailable as a matter of public policy when it is predicated on conduct which leads to the dissolution of a marriage." *Pickering*, 434 N.W.2d at 761. But this means that the tort of IIED *is* available when the marriage does not dissolve. In other words, a person being abused by their spouse may sue for IIED, but only if they stay married to their abuser.

[¶22.] Moreover, for conduct to be actionable under IIED, "it must be so extreme in degree as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *Estate of Johnson ex rel. v. Weber*, 2017 S.D. 36, ¶ 17, 898 N.W.2d 718, 726. Thus, a spouse seeking to retain the full scope of his or her rights must endure unendurable conduct. "Although the preservation of marital harmony is a respectable goal, behavior which is truly outrageous and results in severe emotional distress should not be protected in some sort of misguided attempt to promote marital peace." *McCulloh v.*

*Drake*, 24 P.3d 1162, 1169 (Wyo. 2001) (citing *Henriksen v. Cameron*, 622 A.2d 1135, 1139 (Me. 1993)). Indeed, where such conduct has occurred, there is little marital harmony left to preserve.

[¶23.] In failing to avert familial and marital discord, the *Pickering* rule also diminishes justice because the remaining remedies available through other causes of action may prove inadequate. For example, the torts of battery and assault are available to a harmed spouse under *Pickering*. But intense domestic harm may be inflicted in ways other than physical assault or the threat thereof. "The tort of intentional infliction of emotional distress 'is especially appropriate for a continuing pattern of domestic abuse.'" *Christians v. Christians*, 2001 S.D. 142, ¶ 38 n.3, 637 N.W.2d 377, 385 n.3 (Konenkamp, J., concurring specially) (quoting Douglas D. Scherer, *Tort Remedies for Victims of Domestic Abuse*, 43 S.C.L. Rev. 543, 544 (1992)). For example, Sally may be able to bring individual claims of battery and assault against Michael, but she will not be able to seek a remedy, including the possibility of punitive damages, for his outrageous conduct towards her. *See Bass v. Happy Rest, Inc.*, 507 N.W.2d 317, 324 (S.D. 1993) ("Punitive damages may be considered in connection with [IIED]."). As the Wyoming Supreme Court recognized, "[e]motional distress is as real and tormenting as physical pain, and psychological well-being deserves as much legal protection as physical well-being." *McCulloh*, 24 P.3d at 1169 (citing *Henriksen*, 622 A.2d at 1139). The *Pickering* rule therefore fails to address the harm remedied by a claim of IIED.

[¶24.] The *Pickering* rule also creates an artificial barrier to tort recovery. In *Christians*, this Court affirmed an award for IIED based on conduct arising *after*

*initiation* of divorce proceedings. 2001 S.D. 142, ¶ 33, 637 N.W.2d at 384. Justice Konenkamp's special concurrence rejected as "artificial a distinction between acts occurring before and after commencement of [a] divorce action" but joined "in the Court's recognition of the tort of [IIED] in the marital context." *Id.* ¶ 38, 637 N.W.2d at 385 (Konenkamp, J., concurring specially). The concurrence reasoned that whether an aggrieved former spouse could seek a remedy for "a prolonged policy of sabotage, seeking to destroy his [spouse's] future" should not depend on when divorce papers are filed. *Id.* Likewise, the right to sue for IIED should not depend on when an ex-spouse filed for divorce.

[¶25.] The only remaining justification for the *Pickering* rule is to prevent an IIED claim from being filed simultaneously with or after every divorce action and avoid a floodgate of litigation. The concurrence of Justice Henderson in *Pickering* reveals as much when he notes that our courts would be "flooded with litigation" if IIED suits are permitted for conduct that led to a divorce. 434 N.W.2d at 764 (Henderson, J., concurring in part, dissenting in part). The assertion, however, that there could be an IIED suit for every argument, whether over "the family dog, who takes out the garbage, who forgot to pay the bill, or who is spending too much money," *id.*, ignores the high hurdles a plaintiff must clear in order to prove an IIED claim.

[¶26.] "Proof under [IIED] must exceed a rigorous benchmark." *Weber*, 2017 S.D. 36, ¶ 17, 898 N.W.2d at 726. A prima facie case for IIED requires a showing of "(1) extreme and outrageous conduct by the defendant; (2) that the defendant intended to cause severe emotional distress; (3) there must be a causal connection

between the wrongful conduct and the emotional distress; (4) and severe emotional distress must result." *Christians*, 2001 S.D. 142, ¶ 23, 637 N.W.2d at 382. "The law intercedes only when the distress is so severe that no reasonable person should be expected to endure it." *Id.* ¶ 42, 637 N.W.2d at 386 (Konenkamp, J., concurring specially). Forgetting to take out the garbage and other garden-variety frictions will not rise to this level.

[¶27.] This high threshold prunes out nonmeritorious suits from the system, and there is no reason to believe it will fail to do so for IIED claims based on conduct during the marriage that also serves as legal grounds for divorce. Further, courts are equipped to "sanction attorneys who regularly bring or assist in bringing meritless tort claims in unison with divorce actions, as authorized by SDCL 15-6-11(a)-(d)." *Id.* (Konenkamp, J., concurring specially). And "if a court dismisses such a claim because it was frivolously or maliciously brought, then the court *must* order the offending party to pay part or all of the expenses incurred by the defense, including reasonable attorneys' fees." *Id.* ¶ 44 (Konenkamp, J., concurring specially) (emphasis added). To deny relief to former spouses because of this concern is contrary to good public policy and the role of the courts. As William Prosser noted, "[I]t is the business of the law to remedy wrongs that deserve it, even at the expense of a 'flood of litigation,' and it is a pitiful confession of incompetence on the part of any court of justice to deny relief on such grounds." William L. Prosser, *Handbook of the Law of Torts* § 12, at 51 (4th ed. 1971). The trial courts of this state are highly competent and routinely apply the appropriate burden of proof

to dismiss frivolous claims. There is no reason to believe they will be unable to properly evaluate these claims.

[¶28.] With respect to the decisions of other courts, we note the rarity of the exact issue now before us, namely whether public policy prevents a person from bringing an IIED suit against a former spouse for conduct that led to dissolution of the marriage. But "the majority [of courts] have recognized that public policy considerations should not bar actions for [IIED] between spouses *or former spouses* based on conduct occurring during the marriage." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 82 (Ill. 2003) (emphasis added) (citing *Henriksen*, 622 A.2d at 1140). The *Feltmeier* court remarked, "[W]hile we agree that special caution is required in dealing with actions for [IIED] arising from conduct occurring within the marital setting, our examination of both the law of this state and the most commonly raised policy concerns leads us to conclude that no valid reason exists to restrict such actions or to require a heightened threshold for outrageousness in this context." *Id.* "Indeed, judicial recognition of emotional distress claims in the context of marriages has been described as a 'national trend.'" *McCulloh*, 24 P.3d at 1169 (quoting Meredith L. Taylore, Comment, *North Carolina's Recognition of Tort Liability for the Intentional Infliction of Emotional Distress During Marriage*, 32 Wake Forest L. Rev. 1261, 1278 (1997)).

[¶29.] Numerous states permit IIED suits between current or former spouses for conduct that occurred during marriage.[6] Although New York and Maryland

---

6. The following cases touch on a variety of contexts and circumstances, but they all either affirmatively recognize that public policy does not prevent

(continued . . .)

_____
(. . . continued)

IIED claims between current or former spouses; permit such IIED claims to advance to trial; or dismiss such IIED claims for failing to provide sufficient evidence or on other procedural grounds. *See, e.g., Simmons v. Simmons*, 773 P.2d 602, 603-04 (Colo. Ct. App. 1988) (holding that "the trial court [did not] err[] when it allowed an independent civil action alleging the tort of [IIED]" between former spouses because "[i]n Colorado a wife may sue her husband for damages for personal injuries caused by the conduct of her husband"); *Whelan v. Whelan*, 588 A.2d 251, 252-53 (Conn. Super. Ct. 1991) (permitting an IIED suit by a plaintiff against her former husband for conduct before divorce because the fact that the defendant "is the husband himself should make no legal difference"), *abrogated on other grounds by Venkatesan v. Venkatesan*, No. MMXCV106002880S, 2013 WL 388126 (Conn. Super. Ct. Jan. 4, 2013); *Spence v. Spence*, No. K11C-06-035 JTV, 2012 WL 1495324 at *4 (Del. Super. Ct. Apr. 20, 2012) (granting defendant's motion to dismiss an IIED claim by former spouse because "plaintiff has failed to sufficiently allege extreme and outrageous conduct as a matter of law"); *Neal v. Neal*, 873 P.2d 871, 876 (Idaho 1994) (stating that "[i]ndependent of her attempt to recover for the interference with her marital relationship, [plaintiff] seeks to recover from [former husband], under theories of negligent and intentional infliction of emotional distress" but dismissing the claims based on the lack of evidence to show emotional distress); *Feltmeier*, 798 N.E.2d at 82 (holding that "neither the policy considerations commonly raised nor the law of this state support a conclusion that an action for [IIED] based upon conduct occurring in the marital setting should be barred or subject to any heightened threshold for establishing outrageousness"); *Whittington v. Whittington*, 766 S.W.2d 73, 74-75 (Ky. Ct. App. 1989) (affirming a dismissal of an IIED claim filed in a divorce proceeding because the allegations did not "rise to the level of outrageousness necessary for tortious liability"); *Caron v. Caron*, 577 A.2d 1178, 1179 (Me. 1990) (upholding a jury verdict for a plaintiff against her former spouse for assault, battery, and IIED both before and after their divorce); *Okoli v. Okoli*, 963 N.E.2d 737, 745-46 (Mass. App. Ct. 2012) (affirming dismissal of husband's IIED claim against wife because "the wife's actions as alleged fall short of the level of shocking malevolence required"); *G.A.W., III v. D.M.W.*, 596 N.W.2d 284, 289-90 (Minn. Ct. App. 1999) (disagreeing in part with *Pickering* and holding that "[b]ecause interspousal immunity does not apply, we conclude there is no recognized legal barrier preventing a person from bringing fraud, misrepresentation, or [IIED] claims against his or her current or former spouse"); *Germany v. Germany*, 123 So. 3d 423, 433-34 (Miss. 2013) (denying a motion by former husband defendant to transfer IIED claim brought by former spouse plaintiff to the court handling the divorce proceeding because plaintiff's "claim against [former husband] for intentional and negligent infliction of emotional distress should be retained by the circuit court"); *Horwitz v. Horwitz*, 16 S.W.3d 599, 604-05

(continued . . .)

-17-

_____

(. . . continued)

(Mo. Ct. App. 2000) (affirming the dismissal of plaintiff's IIED claim against husband because plaintiff waived her argument on appeal by failing to cite authority indicating that res judicata and collateral estoppel did not bar her claim); *Ruprecht v. Ruprecht*, 599 A.2d 604, 605-06 (N.J. Super. Ct. Ch. Div. 1991) ("Can one spouse sue the other for . . . [IIED] in absence of physical injury in a divorce action?  There is no doubt that one spouse can sue the other for an intentional tort causing personal injury and the damage that ensues therefrom."); *Hakkila v. Hakkila*, 812 P.2d 1320, 1326-27 (N.M. Ct. App. 1991) (holding IIED suits between spouses are not barred because "New Mexico has not witnessed an onslaught of claims of [IIED] by one spouse against the other"); *Miller v. Brooks*, 472 S.E.2d 350, 356-57 (N.C. Ct. App. 1996) (reversing the dismissal of plaintiff's IIED claim against spouse and others and remanding for trial because fact questions existed on whether defendants were liable for IIED); *Miller v. Miller*, 956 P.2d 887, 899-902 (Okla. 1998) (reversing the dismissal of plaintiff's IIED claim against his former wife and her parents because a jury could find their behavior sufficiently extreme and outrageous); *Garber v. Garber*, 32 P.3d 921, 922, 924-25 (Or. Ct. App. 2001) (reversing summary judgment and remanding for trial a plaintiff's IIED and battery claims against her former husband); *Mazzone v. Mazzone*, No. 10111-A-1980, 1981 WL 767 (Pa. Ct. Common Pleas Feb. 13, 1981) (requiring husband defendant to answer wife plaintiff's complaint alleging IIED, among other torts, because the court abolished interspousal tort immunity for intentional torts); *Wright v. Zielinski*, 824 A.2d 494, 499 (R.I. 2003) (affirming dismissal of an IIED claim by plaintiff against former wife for conduct that occurred during divorce proceedings because plaintiff failed "[t]o establish the causal connection between the wife's alleged misconduct and the husband's psychological and physical complaints"); *Twyman v. Twyman*, 855 S.W.2d 619, 620 (Tex. 1993) ("[W]e expressly adopt the tort of [IIED], and hold that such a claim can be brought in a divorce proceeding."); *Noble v. Noble*, 761 P.2d 1369, 1370, 1374 (Utah 1988) (deciding to "reverse the grant of summary judgment [for defendant] and remand for further proceedings on the claims of battery and [IIED]" brought by plaintiff against her former husband shortly after he "shot her in the head at close range with a .22 caliber rifle" and she filed for divorce); *Endres v. Endres*, 912 A.2d 975, 976-77 (Vt. 2006) (affirming the dismissal of plaintiff's IIED claim against her former husband because she could not prove the intent required for an IIED claim); *Fernau v. Fernau*, 694 P.2d 1092, 1100 (Wash. Ct. App. 1984) (stating that in an appeal from a judgment of divorce, "the parties agreed that [plaintiff's] tort claims against [defendant] for outrage and [IIED] were not a proper part of the dissolution proceeding, and were to be reserved to [plaintiff]"); *Courtney v. Courtney*, 437 S.E.2d 436, 443 (W. Va. 1993) (holding that a claim for IIED must be brought within two years in the context of an IIED suit by a plaintiff against her former husband

(continued . . .)

have adopted public policy prohibitions against IIED claims under similar circumstances,[7] this is the minority position. Many courts consider claims for IIED against third parties with whom a spouse committed adultery to be, in effect, actions for alienation of affections or criminal conversion. These courts dismiss such IIED claims primarily because their state's legislature abolished the torts of alienation of affections or criminal conversion via statute.[8] These cases, however,

---

(. . . continued)

and accordingly reversing the trial court's grant of summary judgment in favor of defendant former husband and remanding for trial); *McCulloh*, 24 P.3d at 1170 ("We are convinced that extreme and outrageous conduct by one spouse which results in severe emotional distress to the other spouse should not be ignored by virtue of the marriage of the victim to the aggressor and hold that such behavior can create an independent cause of action for [IIED].").

7. *Doe v. Doe*, 747 A.2d 617, 621-25 (Md. 2000) (dismissing husband's IIED claim against wife in a divorce proceeding because "[t]he public policy of this State, reflected in the abolition of the actions for alienation of affections and criminal conversation, required the dismissal of the tort actions asserted in this case"); *Xiao Yang Chen v. Fischer*, 843 N.E.2d 723, 725 n.2 (N.Y. 2005) (holding that New York does not recognize the tort of IIED between spouses).

8. *See, e.g., Bailey v. Faulkner*, 940 So. 2d 247, 253 (Ala. 2006) (dismissing a plaintiff's claim against a man whose allegedly intentional conduct led to the failure of plaintiff's marriage and extreme mental anguish because "[t]he only claims stated by the allegations in this case assert the amatory torts abolished by [statute]"); *Richard P.*, 249 Cal. Rptr. 246 (concluding that it is against California public policy to permit a claim for IIED against wife's paramour based on conduct that occurred during marriage); *Speer v. Dealy*, 495 N.W.2d 911, 914 (Neb. 1993) (holding that the tort of IIED is unavailable when it is in effect a suit for alienation of affections or criminal conversion, because the Nebraska Legislature abolished those causes of action); *Koestler v. Pollard*, 471 N.W.2d 7, 9-10 (Wis. 1991) (dismissing an IIED suit by a married man against his wife's alleged paramour because plaintiff's claim "in essence states a claim for criminal conversation and is barred by [statute]" and such a claim violates public policy); *Strock v. Pressnell*, 527 N.E.2d 1235, 1243 (Ohio 1988) (dismissing a plaintiff's IIED claim against a man whose conduct led to his divorce and emotional suffering because "the torts of

(continued . . .)

do not support a *Pickering*-type bar on IIED suits between spouses. First, the South

Dakota Legislature has not abolished the tort of alienation of affections, although

we have abrogated the tort of criminal conversion.[9] *See Veeder*, 1999 S.D. 23, ¶¶

18, 23, 589 N.W.2d at 615-16. Thus, our law permits recovery against a paramour

for engaging in adultery to the harm of a plaintiff spouse. Second, these torts are

not remedies against a spouse, current or former, but are meant to provide a

recovery for the wrongful conduct of a tortfeasor *outside* of the marriage

relationship. Although these cases disapprove of IIED suits for conduct occurring in

marriage, they are inapposite to assessing whether Sally has a remedy against

Michael.

[¶30.]     On remand, the trial court must grapple with the problems recognized

in Justice Konenkamp's special concurrence in *Christians*. Justice Konenkamp

identified a split among states over how joinder and principles of preclusion apply to

tort claims brought after a divorce action. *Christians*, 2001 S.D. 142, ¶ 47, 637

---

(. . . continued)
> alienation of affections and criminal conversation, which were abolished by [statute], are not revived by the recognition of the independent tort of [IIED]").

9.     The tort of alienation of affections has three elements: (1) wrongful conduct by the defendant with specific intent to alienate one spouse's affections from the other spouse; (2) loss of affection or consortium; and (3) a causal connection between such intentional conduct and loss. *State Farm*, 2007 S.D. 107, ¶ 24, 741 N.W.2d at 236. "The tort of criminal conversion allows one to maintain an action for damages if it is shown that his or her spouse committed adultery with the defendant . . . ." *Hunt v. Hunt*, 309 N.W.2d 818, 820 (S.D. 1981).

N.W.2d at 387 (Konenkamp, J., concurring specially).[10] Issues may also arise regarding attorney's fees and double recovery. *Id.* As the parties have not briefed these issues, we leave them to the trial court to first consider on remand.

[¶31.] *Pickering* established a broad holding based on a narrow set of facts and did not contemplate the kind of circumstances now before us. In so doing, *Pickering* also failed to defer to the Legislature. We overturn *Pickering* and allow those otherwise unable to seek redress for the kinds of abuse Sally suffered to pursue a claim for IIED. Because *Pickering* no longer mandates that a Rule 12(b)(5) motion to dismiss be granted, we reverse the circuit court and remand for further proceedings consistent with this opinion.

---

10. States today remain divided over these procedural issues. 41 *Causes of Action* 2d 407 § 17 (2009), Westlaw (database updated December 2017) (surveying state court decisions). The majority either forbids joinder or, if it is permitted, strongly discourages it, "with the result that claim preclusion does not arise." *Id.* With respect to claim and issue preclusion, some courts have crafted an exception due to the different purposes underlying divorce and tort actions. Clare Dalton, *Domestic Violence, Domestic Torts and Divorce: Constraints and Possibilities*, 31 New Eng. L. Rev. 319, 376-77 (1997); Andrew Schepard, *Divorce, Interspousal Torts, and Res Judicata*, 24 Fam. L. Q. 127, 131 (1990). Other courts highlight the difficulties joining a tort claim to a divorce action would present, concluding that doing so would unduly complicate the process. They therefore prohibit tort claim filed with divorce actions, and because the claim could not have been litigated in the prior action, preclusion does not apply. *See, e.g.*, *Nelson v. Jones*, 787 P.2d 1031, 1034-35; *Noble*, 761 P.2d at 1374 (citing *Walther v. Walther*, 709 P.2d 387, 388 (Utah 1985)). The minority position examines whether the "action for divorce and [the] tort claim . . . evolve from a common factual nucleus and raise interrelated economic issues that should be resolved in a single proceeding." Schepard, *supra*, at 131. However, courts must still determine "pragmatically . . . whether [a grouping] forms[s] a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations[.]" *Restatement (Second) of Judgments* § 24 (1982). Thus, situations involving domestic violence may pose unique challenges. Schepard, *supra*, at 153; *see also* Dalton, *supra*, at 386-88; Scherer, *supra* ¶ 23, at 566-73.

[¶32.]        ZINTER, Justice, and WILBUR, Retired Justice, concur.

[¶33.]        GILBERTSON, Chief Justice, and SEVERSON, Justice, concur in result.

[¶34.]        JENSEN, Justice, not having been a member of the Court at the time this action was assigned to the Court, did not participate.


SEVERSON, Justice (concurring in result).

[¶35.]        I agree that *Pickering* should be overruled, but only to the extent that it is interpreted to mean that the right to sue for IIED depends on when divorce papers are filed. A person being abused by their spouse should not have to stay married to his or her abuser in order to seek redress. However, as Justice Konenkamp recognized in *Christians*, "[a] spouse should not reap tort damages on the same misconduct that generated an alimony award." 2001 S.D. 142, ¶ 43, 637 N.W.2d at 386 (Konenkamp, J., concurring specially). More importantly, "counsel must be aware that these matters are subject to the principles of preclusion through res judicata and estoppel." *Id.* ¶ 46. Indeed, issues tried and decided in a divorce action could foreclose subsequent litigation on the same matters. *Id.*; Restatement (Second) of Judgments § 24 (1982). Was the divorce truly a no-fault divorce? Did the parties litigate issues of fault or seek alimony in the divorce proceeding? Justice Konenkamp highlighted these and other concerns, and I adopt the principles articulated by him in *Christians*. 2001 S.D. 142, ¶¶ 37-48, 637 N.W.2d at 384-87.

[¶36.]        A comprehensive law review article examined the effect of res judicata, observing that res judicata may bar a subsequently filed interspousal tort action

-22-

because an "action for divorce and [a] tort claim both evolve from a common factual nucleus and raise interrelated economic issues that should be resolved in a single proceeding." Andrew Schepard, *Divorce, Interspousal Torts, and Res Judicata*, 24 Fam. L.Q. 127, 131 (1990). As explained in the Restatement (Second) of Judgments § 24(1), claim preclusion extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Because the facts establishing both claims—tort and divorce—are many times inseparably entangled, a reasoned approach would be to apply the "same transaction analysis" to determine the preclusive effect of a prior divorce action. *Id.*; Schepard, *supra* ¶ 36, at 135. The same transaction analysis determines what factual grouping constitutes a "transaction" by "pragmatically[ ] giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." Restatement (Second) of Judgments § 24(2).

[¶37.]     Over time, courts have expanded the possibility of spouses to recover in tort for harm inflicted during the marriage. Schepard, *supra* ¶ 36, at 131. We now join those courts and overrule *Pickering*. Therefore, it bears repeating the concerns highlighted by Justice Konenkamp:

> What thresholds and sanctions, for instance, must courts impose to prevent meritless claims from congesting and polluting the domestic relations process? Should courts routinely allow these torts to be tried at the same time as the divorce action, or should they be tried separately? What are the preclusive effects of waiting to bring this tort claim until after the divorce? In

> combining torts with domestic relations, can lawyers use contingent fee agreements in family law matters, or should they have separate fee agreements with the client?

*Christians*, 2001 S.D. 142, ¶ 39, 637 N.W.2d at 385 (Konenkamp, J., concurring specially). As he said, "These are just a few of the many issues yet to be resolved." *Id.* Our decision today clarifies a party's right to pursue tort damages but certainly leaves many procedural and substantive legal issues unanswered because they are not properly before the Court in this case.

[¶38.]     GILBERTSON, Chief Justice, joins this concurrence in result.